UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
MARTA BUENO

                    Plaintiff,

    -against-


EUROSTARS HOTEL COMPANY, S.L.,
FRONT PROPERTY HOTEL CORPORATION, and
AMANCIO LOPEZ SEIJAS, jointly and severally,

                Defendants.
-------------------------------------------------------------------x

Civ. No. 1:21-cv-00535-JGK-RLW

**SECOND AMENDED COMPLAINT**

Trial by Jury Demanded

Plaintiff MARTA BUENO, by and through the undersigned counsel and for her Second Amended Complaint against Defendants EUROSTARS HOTEL COMPANY, S.L., FRONT PROPERTY HOTEL CORPORATION, and AMANCIO LOPEZ SEIJAS (collectively, the "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this action seeking relief against Defendants for gender and pregnancy discrimination and unlawful retaliation in violation of Title VII of the 1964 Civil Rights Act, as amended by the Pregnancy Discrimination Act ("Title VII"); the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code §§ 8-101 *et seq.* ("NYCHRL").

2.    The claims at issue in this matter involve Defendants' blatant and egregious discrimination of Plaintiff on account of her pregnancy, and their craven retaliation against her for continuing with this lawsuit following an unsuccessful mediation.

3.    Indeed, notwithstanding Plaintiff's excellent 13-year record working for Defendants, Defendants summarily terminated Plaintiff's employment five days after learning that

1

she was pregnant.  Plaintiff's becoming pregnant was no surprise to Defendants, who were aware that Plaintiff wanted and, in fact, had undergone in vitro fertilization ("IVF") treatment to become pregnant in the first place.

4.      Making matters worse, in an attempt to intimidate the Plaintiff for exercising her right to pursue her claims through this lawsuit, Defendants retaliated against her by seeking, with no basis, to require that she submit to an unnecessary "an independent medical examination ["IME"] by a licensed mental health professional."

5.      Plaintiff seeks to remedy the harm that she suffered as a direct and proximate consequence of Defendants' unlawful termination of her employment and as a direct and proximate consequence of Defendants' unlawful retaliation.

6.      Plaintiff seeks declaratory relief, economic damages, emotional distress damages, out-of-pocket costs and expenses, any other available compensatory damages, punitive damages, and pre- and post-judgment interest for Defendants' violations of Title VII, the NYSHRL, and the NYCHRL, as well as all other remedies available to her under the law and facts of this case.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1332, 1343, 1964, 3729 and other relevant federal statutes.

8.      This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendants.

9.      Venue is proper pursuant to 28 U.S.C. § 1391 because Defendants operate within New York County, including a hotel located at 129 Front St, New York, NY 10005.  Furthermore, at all times relevant to determining venue in this action, Plaintiff was employed by Defendants in

New York County and the acts and/or omissions giving rise to Plaintiff's claims occurred in New York County.

10.    Following the filing of this pleading, a copy of this Second Amended Complaint will be served on the New York City Commission on Human Rights, thereby satisfying the notice requirement of § 8-502(c) of the New York City Administrative Code.

## **PARTIES**

11.    PLAINTIFF MARTA BUENO ("Plaintiff" or "Bueno") is an adult woman who, at times relevant to this Complaint, has resided in New York City.

12.    Plaintiff was born on April 23, 1978 and is 44-years old.

13.    Plaintiff's employment with the Defendants' hotel group began in or about October 2007.  In October 2013, Plaintiff was transferred to work in New York City and was employed by Defendants until the termination of her employment on February 25, 2020.

14.    EUROSTARS HOTEL COMPANY, S.L. ("Eurostars"), at all times relevant to this matter, has operated a hotel located at 129 Front Street, New York, New York 10005, United States.  Until in or about 2016, Defendant Eurostars also operated a hotel at 52 East 41st Street, New York, New York 10017.

15.    At all times relevant to this Complaint, and jointly with the other Defendants, Eurostars Hotel Company, S.L. has employed at least 22 individuals within the State of New York.

16.    On Plaintiff's Spanish government labor and employment report, Eurostars Hotel Company, S.L.U. is listed as Plaintiff's employer beginning on or around mid-2015.  At the time her employment was terminated by Defendants, Defendant Eurostars employed Plaintiff jointly with the other Defendants.  Defendant Eurostars exercised control, along with the other Defendants, over the decision to terminate Plaintiff's employment effective January 25, 2020.

17.    Prior to mid-2015, and upon the representations of counsel for Defendants, Eurostars Hotel Company, S.L.U. was named Agincourt 2008, S.L.U.

18.    FRONT PROPERTY HOTEL CORPORATION ("Front Property Hotel"), jointly with Eurostars, operates one hotel in New York City located at 129 Front St, New York, New York 10005 and, until about 2016, a hotel located at 52 East 41st Street, New York, New York 10017

19.    At all times relevant to this Complaint, and jointly with the other Defendants, Front Property Hotel has employed at least 15 individuals within the County of New York.

20.    Plaintiff's employment with the Defendants' hotel group began in or about October 2007.  In October 2013, Plaintiff was transferred to work in New York City and was employed by Defendants, including Defendant Front Property, until February 25, 2020.  At the time her employment was terminated by Defendants, Defendant Front Property Hotel employed Plaintiff jointly with the other Defendants.  Defendant Front Property Hotel exercised control, along with the other Defendants, over the decision to terminate Plaintiff's employment effective January 25, 2020.

21.    AMANCIO LOPEZ SEIJAS is the owner and Chief Executive Officer ("CEO") of Eurostars Hotel Company and Front Property Hotel Corporation (jointly, the "Corporate Defendants").

22.    At all times relevant, Defendant Lopez Seijas has regularly transacted business within the State of New York, in both his individual capacity and his capacity as owner and CEO of the two Corporate Defendants.

23.    Specifically, and although Defendant Lopez Seijas lives in Spain, at all times relevant, Defendant Lopez Seijas has come to New York to manage his hotels, including the Corporate Defendants, as well as Plaintiff's work, approximately four (4) times per year. The

remainder of the time he has managed the Corporate Defendants and supervised Plaintiff's work remotely.

24.     At all times relevant, between October 2007 and February 25, 2020, Defendant Lopez Seijas was Plaintiff's employer.   At the time her employment was terminated by Defendants, Defendant Lopez Seijas employed Plaintiff jointly with the other Defendants. Defendant Lopez Seijas exercised control, along with the other Defendants, over the decision to terminate Plaintiff's employment effective January 25, 2020.

25.     Moreover, Defendant Lopez Seijas hired the Plaintiff, made the decision to transfer Plaintiff to the New York location, and ultimately terminated Plaintiff from her employment. At all times relevant, Defendant Lopez Seijas also directed Plaintiff's work and regularly supervised her, and generally controlled the terms and conditions of Plaintiff's employment while she was employed for the Corporate Defendants and Defendant Lopez Seijas.

## PROCEDURAL REQUIREMENTS AND PROCEDURAL HISTORY

26.     On or about April 1, 2020, Plaintiff filed a charge with the EEOC with respect to her gender and pregnancy discrimination claims.

27.     On or about September 25, 2020, Plaintiff received a Right to Sue Letter in connection with her EEOC Charge.

28.     On December 21, 2020, the attorneys for both Plaintiff and Defendants entered into a Stipulation extending Plaintiff's deadline for commencing the instant Complaint until January 21, 2021.

29.     On or about April 9, 2021, counsel for Defendants accepted service on behalf of all named Defendants.

## FACTUAL ALLEGATIONS

**Plaintiff's Employment with Defendants**

30.    In October 2007, Defendant Lopez Seijas hired Plaintiff to work at his hotel in Barcelona, Spain.

31.    The employment contract provided to Plaintiff at the time of her hire was for a six-month contract, dated October 22, 2007, and listing Defendant Lopez Seijas as the individual employer and World Trade Center Hotel, S.L. as the corporate employer.

32.    On November 13, 2007, Plaintiff was provided with a second employment contract—this time for an indefinite period of time—and also listing Defendant Lopez Seijas as the individual employer and World Trade Center Hotel, S.L. as the corporate employer.

33.    In 2013, Plaintiff was transferred to New York City and worked as a hotel general manager at Defendants' New York City hotel location at 129 Front Street, New York, New York.

34.    Due to her outstanding performance, Plaintiff was promoted in 2015 by Defendant Lopez Seijas to the position of as Chief Operating Officer ("COO") of the Defendants' New York City hotels, including the hotel located at 129 Front Street, New York, New York, 10005, and the hotel located at 52 East 41st Street, New York, New York 10017.

35.    The transfer agreement governing Plaintiff's official transfer to New York is between Defendant Lopez Seijas and Plaintiff, with Defendant Lopez Seijas described as "President of the Hoteles Turisticos Unidos" and "Legal representative of all of the companies that form the Hotusa Group."

36.    The Hotusa Group is the holding company that holds several hotel companies, including the two Corporate Defendants, all of which are owned by Defendant Lopez Seijas.

37.     The transfer agreement also states that Plaintiff began an employment relationship with the Hotusa Group on October 22, 2007, where she worked at Eurostars Grand Marina Hotel, and that she is being transferred to work in the United States, where she will work at Eurostars Wall Street, a Hotusa Group hotel.

38.     The position of Chief Operating Officer is one of the most senior positions of Defendants' New York hotels.

39.     At that time, Plaintiff was single, with no children, and was 35-years old.

40.     At that time, Plaintiff's status as young single woman with no children fit into Defendant Lopez Seijas's preference of hiring individuals under the age of 40, and if women, preferably with no children.

41.     Due to Plaintiff's excellent management skills, two years later, in 2015, Plaintiff's duties were expanded to also manage Defendants' hotel located at 52 East 41st Street, New York, New York 10017.

42.     About that time, in 2015, and two years after Plaintiff was transferred to New York, Defendant Lopez Seijas provided Plaintiff with a third employment agreement, which described Defendant Lopez Seijas as the individual employer, Agincourt 2008, S.L.U. as the corporate employer, and Plaintiff as a full-time "Level One Head of Reception."

43.     Moreover, the 2015 employment agreement, which is the employment agreement that governed Plaintiff's employment at the time of her termination, provided for four (4) months of paid maternity leave.

44.     In 2017, and again due to Plaintiff's excellent record working for Defendants, Plaintiff was also tasked with managing the opening of Defendants' two hotels in Miami, Florida.

45.     Plaintiff's management duties also took place in Chicago, Illinois, where in 2019, Plaintiff was tasked with obtaining licenses for Defendants' Chicago hotel, including the hotel's liquor license.

**Defendant Lopez Seijas's Role as Plaintiff's Employer**

46.     At all times relevant, Defendant Lopez Seijas has been the owner and CEO of the Corporate Defendants, has closely surveilled every aspect of each of the Corporate Defendants' business, and in particular, has closely controlled all aspects related to employee management.

47.     Defendant Lopez Seijas is known throughout his companies as maintaining very close relationships with all members of upper management, including Plaintiff while she was employed for him, who he micromanages and with whom he communicates on a daily basis.

48.     In October 2007, Defendants hired Plaintiff to work as a manager at their best hotel in Barcelona. At that time, Plaintiff interacted with Defendant Lopez Seijas on a daily basis, where he would require her to attend daily management meetings.

49.     Because of Plaintiff's hard work, dedication to her job, and loyalty to the company, in 2013 Defendant Lopez Seijas selected Plaintiff to transfer to New York City and worked as a hotel general manager at Defendants' hotel location at 129 Front Street, New York, New York, 10005.

50.     In fact, Defendant Lopez Seijas personally interviewed Plaintiff for the New York City manager position, and after the interview, Defendant Lopez Seijas advised Plaintiff that it was clear to him that Plaintiff knew what was expected of her during her time in New York City in terms of hotel management, cost controls, and hotel quality assurance.

51.     As discussed above, in 2015, due to her outstanding performance, Plaintiff was promoted by Defendant Lopez Seijas to the position of COO of the Defendants' hotels in New

York City.  In addition to being the COO overseeing operations at Defendants' hotel location at 129 Front Street, New York, New York, 10005, Plaintiff also began overseeing hotel operations at Defendants' hotel location at 52 East 41st Street, New York, New York 10017.

52.    In 2015, after Plaintiff's promotion to COO, Plaintiff was required to send weekly reports directly to Defendant Lopez Seijas related to, *inter alia*, hotel operations and any issues, quality performance, staff related matters, and cost control.

53.    Cristina Marroqui ("Ms. Marroqui"), the head of international sales for Defendant Eurostars, was copied to all of Plaintiff's weekly reports to Defendant Lopez Seijas, which are now exclusively in the possession and control of Defendants.

54.    Moreover, Plaintiff was required to have telephonic conferences with Defendant Lopez Seijas every two days to update him on hotel related business, including the new hotel openings in Miami and Chicago, as well as other matters related to the New York City hotels.

55.    In addition, throughout Plaintiff's employment for Defendants in New York, Defendant Lopez Seijas came to New York City at least four (4) times per year and stayed for at least one (1) week each visit.

56.    During Defendant Lopez Seijas' visits to New York, Plaintiff was required to remain at his beck and call, twenty four hours of each day of his stay, for meetings related to the hotel business, but also to ensure that his stay was perfect in every aspect, and was therefore also required to handle all restaurant and theater reservations, and to ensure that Defendant Lopez Seijas's family and friends (if they were in accompaniment) were comfortable and taken care of.

57.    As a result of Defendant Lopez Seijas's close oversight of all employment related matters of his hotels, and especially his tight micromanagement of all members of upper

management, at all times relevant, Defendant Lopez Seijas has been the only individual with authority to terminate upper management employees from their employment.

58.     Accordingly, on February 25, 2020, Defendant Lopez Seijas—as the only person with authority to terminate managers—is the sole individual who decided to terminate Plaintiff from her employment with Defendants.

**Cristina Marroqui Becomes Plaintiff's Direct Supervisor**

59.     On or about February 1, 2018, while Plaintiff was working for the Defendants in New York City, Defendants asked Plaintiff to begin undertaking tasks in the Corporate Defendants' area of sales, which was overseen by Ms. Marroqui.

60.     Thus, between February 1, 2018 and February 25, 2020, Ms. Marroqui was Plaintiff's direct supervisor. In that capacity, Ms. Marroqui directed and supervised Plaintiff's work.

61.     Between on or about February 1, 2018 and February 25, 2020, and because Ms. Marroqui was physically based in Spain, Plaintiff was required to have conference calls with Ms. Marroqui at least once a week, but oftentimes more. Plaintiff and Ms. Marroqui also regularly communicated via WhatsApp.

62.     While Plaintiff's direct supervisor, Ms. Marroqui would come to New York City approximately four (4) times per year.

63.     Due to their regular work contact, Plaintiff and Ms. Marroqui became friends, and frequently shared personal details about their lives. Moreover, during Ms. Marroqui's frequent trips to New York City, the two women would spend time together sightseeing and generally hanging out together sharing life stories and confiding in one another.

64.    During the many occasions that Ms. Marroqui and Plaintiff spent sharing personal stories with one another, Ms. Marroqui often confessed to Plaintiff that she "hated" her own friends when any of them made pregnancy announcements because she and her partner could not have children due to his vasectomy.

65.    At all times relevant, Ms. Marroqui has been very close to Defendant Lopez Seijas, travelling from Sevilla to Madrid weekly to meet with Defendant Lopez Seijas. During these trips to Madrid, in addition to business meetings, Defendant Lopez Seijas and Ms. Marroqui spent quality time together, including dining together.

66.    At all times relevant, Ms. Marroqui and Defendant Lopez Seijas have also spoken over the telephone on a regular basis, and at least every other day.

67.    During their conversations, Ms. Marroqui updated Defendant Lopez Seijas on subjects related to employees, including disclosing gossip and personal information about employees to which she was privy.

68.    During their conversations, Ms. Marroqui informed Defendant Lopez Seijas of her concerns related to Defendants' employees, and would suggest actions to be taken, but it was ultimately always Defendant Lopez Seijas who took the ultimate decisions on all matters related to hiring and firing Defendants' upper-level employees, including Plaintiff.

**Defendants' Unlawful Termination of Plaintiff's Employment**

69.    At the end of December, 2019, Plaintiff informed Ms. Marroqui of her desire to have a child and go through IVF in order to become pregnant.  During this conversation, Plaintiff noted that at 41-years old, IVF was the only option for Plaintiff to become pregnant.

70.    During this conversation, Ms. Marroqui stated, in sum and substance, "that's nice, but, you know this company… Mr. Lopez doesn't like people taking leave because it ends up being a cost for the company. He wants employees to work no matter what."

71.    On January 3, 2020, Plaintiff advised Ms. Marroqui that she would undergo IVF treatments later that month.

72.    During this conversation, Ms. Marroqui acted annoyed with Plaintiff for her plans to become pregnant and eventually take maternity leave.

73.    Shortly thereafter, based on Ms. Marroqui's close contact and regular communication with Defendant Lopez Seijas over all personal matters of Defendants' employees, Ms. Marroqui advised Defendant Lopez Seijas that Plaintiff would soon undergo IVF treatments.

74.    Indeed, starting on or about January 30, 2020, Plaintiff underwent IVF treatment. The IVF treatment lasted several days.  Embryo transfer to Plaintiff's uterus occurred on February 4, 2020.

75.    On February 20, 2020, Plaintiff received confirmation from her doctor that her IVF procedure had been successful and that she was pregnant.

76.    Shortly thereafter, and also on February 20, 2020, Ms. Marroqui called Plaintiff on the internet application WhatsApp to briefly discuss a work-related matter.

77.    Towards the end of the WhatsApp call, Plaintiff informed Ms. Marroqui that her IVF had been successful and that she was pregnant.

78.    Ms. Marroqui, clearly taken aback and sounding annoyed, stated coldly (in sum and substance), "oh congratulations. I'm entering a meeting now, and will call you back later."

79.    At no point did Ms. Marroqui call Plaintiff back.

80.     Instead, and based on Ms. Marroqui's close contact and regular communication with Defendant Lopez Seijas over all personal matters of Defendants' employees, Ms. Marroqui called Defendant Lopez Seijas to inform him that Plaintiff was pregnant.

81.     On February 25, 2020, only five days after Plaintiff had informed Defendants that her IVF treatment had been successful and that she was pregnant, Defendants terminated Plaintiff from her employment.

82.     The termination letter provided to Plaintiff by Defendants on February 25, 2020 was signed by a representative of Defendant Front Property Hotel Corporation, and provided no basis for Plaintiff's termination. Defendants did not provide Plaintiff with any basis or explanation for the termination of her employment.

83.     Based on Ms. Marroqui's close contact and regular communication with Defendant Lopez Seijas on all personal issues related to Defendants' employees, prior to Plaintiff's termination, Ms. Marroqui told Defendant Lopez Seijas that Plaintiff was pregnant.

84.     As the only individual with the authority to hire and terminate the employment of upper-level managers such as Plaintiff, Defendant Lopez Seijas decided to terminate Plaintiff from her employment.

85.     Defendant Lopez Seijas's main concern as the owner and CEO of the Corporate Defendants is cutting costs and saving money.

86.     Defendant Lopez Seijas was aware that Plaintiff's employment was governed by the 2015 employment contract, which entitled her to four months of maternity leave due to her pregnancy.

87.     The day her employment was terminated, Plaintiff called Brian Dunning, Esq. ("Mr. Dunning") at his cellular phone, but she did not reach Mr. Dunning immediately. The next

day, on February 26, 2020, Mr. Dunning returned Plaintiff's phone call from the day prior.  Mr. Dunning and Plaintiff discussed the termination of Plaintiff's employment.  Mr. Dunning and Plaintiff knew each other through work and had spent a significant amount of time together in a professional setting.  In Mr. Dunning's own words, he has "long been counsel to [Defendant] Front Corp., having previously communicated at length with Plaintiff in her capacity as an employee thereof."  (Doc 42. at par. 3.)

88.    During their call on February 26, 2020, Plaintiff told Mr. Dunning that she believed her employment was terminated because of her "pregnancy," or words to that effect.  In response, Mr. Dunning told Plaintiff "that's illegal," or words to that effect.  Mr. Dunning, being familiar with Plaintiff's excellent work history, promised that he would "help" Plaintiff find new employment, or words to that effect.  Unfortunately, Mr. Dunning did not make good on his promise to help Plaintiff find new employment.

89.    Also on February 26, 2020, the day after the termination of Plaintiff's employment, Ms. Marroqui sent Plaintiff a text message via WhatsApp that said: "Good morning Marta. Yesterday evening Patricia called me. Personally it has been a pleasure working with you and I wish you luck in your personal life as well as your professional life. Congratulations on your pregnancy and your marriage. I wish you the best with all my heart."

90.    That is, on February 26, 2020, Ms. Marroqui acknowledged Plaintiff's excellent 13-year record while at the same time acknowledging Defendants' knowledge of Plaintiff's pregnancy.

91.    Other than Plaintiff, no other employees were terminated or laid off at our around that time.

92.    Plaintiff's 13-year record working for Defendants was impeccable.

93.     Indeed, for the entirety of her tenure working for Defendants, Plaintiff only received positive feedback related to her performance, and not once did she ever receive any warnings or bad reviews from any of her supervisors.

94.     Defendants' history of discriminatory treatment of employees on account of their gender and age is well-documented in the news media, including Spain's El Diario and El Commercio.

95.     Defendants' discriminatory treatment of Plaintiff falls squarely within their history of preferentially hiring younger employees (and if women, single with no children).

**Defendants Unlawfully Retaliate Against Plaintiff**

96.     In an email dated Wednesday, June 16, 2022 ("Defendants' June 16th Email"), Defendants, through counsel, asserted an intention to require an independent medical examination ("IME") of Plaintiff, stating as follows:

> I have included two new paragraphs [in the draft Rule 26(f) report]. In the first one, plaintiff will agree to submit to an independent medical examination by a licensed mental health professional by September 1, 2022. I will want to have this before we take Marta's [Ms. Bueno's] deposition.

97.     In addition, the Defendants' intention to require Ms. Bueno to undergo an IME is memorialized in the parties' report to the Court under Rule 26(f) of the Federal Rules of Civil Procedure ("FRCP"). (Doc. 56.) Specifically, as stated at Paragraph 9 of the FRCP 26(f) report:

> The parties did not agree on whether Plaintiff shall submit to an Independent Medical Examination in this case. Defendants proposed that "[o]n or before September 1, 2022, plaintiff shall submit to an Independent Medical Examination by a licensed mental health processional," which was rejected by Plaintiff.

98.     In turn, the Court's scheduling order (Doc. 58) directed the parties, if they did not agree, to take their disagreement regarding the medical examination to the assigned Magistrate

Judge.  Indeed, as reflected in the FRCP 26(f) report, Plaintiff did not agree to undergo a medical examination.

99.    By letter dated June 27, 2022 (the "Plaintiff's June 27th Letter") Plaintiff, through counsel, wrote the Defendants regarding their intention to require Plaintiff to undergo an IME, since such an IME is both unnecessary and retaliatory.


[Remainder of Page Left Intentionally Blank]

100.    As Plaintiff's June 27th Letter stated at page 1 of 3:



Kevin J. Shehan
Owner & Founder
kevin@shehanlegal.com

June 27, 2022

*By Email /* bdunning@drdllplaw.com

Brian C. Dunning, Esq.
Dunning Rievman LLP
1350 Broadway, Suite 2120
New York, New York 10018

      Re:    *Marta Bueno v. Eurostars Hotel Company, S.L., et al.*
               1:21-cv-00535-JGK-RWL

Dear Brian,

    As you know, this firm is co-counsel for the Plaintiff, Marta Bueno ("Ms. Bueno"). Pursuant to the parties' obligations to meet and confer regarding discovery disputes, I write regarding the Defendants' effort to require a medical examination of Ms. Bueno.

**Background**

    As background, in an email dated Wednesday, June 16, 2022, Defendants, through counsel, asserted an intention to require a medical examination of Ms. Bueno, stating as follows:

    I have included two new paragraphs [in the draft Rule 26(f) report]. In the first one, plaintiff will agree to submit to an independent medical examination by a licensed mental health professional by September 1, 2022. I will want to have this before we take Marta's [Ms. Bueno's] deposition.

(Email from Brian Dunning, Esq. to Kevin Shehan, Esq. (Jun. 16, 2022).)

    In addition, the Defendants' intention to require Ms. Bueno to undergo a medical examination is memorialized in the parties' report to the Court under Rule 26(f) of the Federal Rules of Civil Procedure ("FRCP"). (Doc. 56.) Specifically, as stated at Paragraph 9 of the FRCP 26(f) report:

    The parties did not agree on whether Plaintiff shall submit to an Independent Medical Examination in this case. Defendants proposed that "[o]n or before September 1, 2022, plaintiff shall submit to an Independent Medical Examination by a licensed mental health processional," which was rejected by Plaintiff.

101.   As Plaintiff's June 27th Letter further stated at page 2 of 3:

Brian C. Dunning, Esq.
June 27, 2022
Page 2

In turn, the Court's scheduling order (Doc. 58) directs the parties, if they do not agree, to take their disagreement regarding the medical examination to the assigned Magistrate Judge. Indeed, as reflected in the FRCP 26(f) report, Ms. Bueno does not agree to undergo a medical examination, which, as discussed below, is unnecessary (and retaliatory).

**A Medical Examination of Ms. Bueno is Unnecessary (and Retaliatory)**

There is no basis to seek a medical examination of Ms. Bueno, and Defendants have cited none. In this case, Ms. Bueno has not designated an emotional distress expert witness. Also, she has not sought excessive emotional distress damages, but instead has sought an amount within the range of "garden variety" damages. In addition, she is not claiming to have developed a mental health condition or physical condition in connection with the discrimination against her, apart from the pregnancy complications that she suffered from stress due to the termination of her employment. Fortunately, Ms. Bueno recovered from her pregnancy complications, and she and her baby are healthy, generally speaking.

It is true that Ms. Bueno claims ongoing emotional distress harm in her Amended Complaint (Doc. 15), in addition to past emotional distress harm, both of which are due to the unlawful termination of her employment. But, that does not mean that Ms. Bueno should be required to undergo a so-called "independent medical examination" by a mental health professional hired by the Defendants, since her claims in this case are based solely on workplace discrimination laws, and there are no independent tort claims for physical or emotional injury.

To be clear: if there were a medical examination into Ms. Bueno's state of mind, it would corroborate the past and ongoing emotional distress that she has suffered due to the Defendants' actions, which Ms. Bueno is poised to testify about at trial, and which she is competent to testify about without the involvement of doctors. Accordingly, a medical examination of Ms. Bueno is unnecessary, and for purposes of discovery it would be sufficient to simply depose her about her emotional distress, both past and ongoing.

There are few violations more personal than being subjected, involuntarily, to proverbial poking and prodding into one's mental state by a mental health professional at the behest of one's adversary. As the victim of workplace discrimination, Ms. Bueno should not have to face further victimization through the very litigation that she brought to vindicate her rights. In this case, the current effort to require a medical examination of Ms. Bueno is a craven act, perpetrated by the Defendants, apparently done to dissuade Ms. Bueno from continuing with this litigation. Please note that the foregoing statements are directed at the Defendants, themselves, and not their counsel.

For all the foregoing reasons, we request that Defendants drop the matter and discontinue their effort to require Ms. Bueno to undergo a medical examination. Moreover, this letter is notice that the effort by the Defendants to require a medical examination of Ms. Bueno is unlawful retaliation and will be treated as such, unless confirmation is received this week that the matter is

102.   As Plaintiff's June 27th Letter stated at page 3:

---

Brian C. Dunning, Esq.
June 27, 2022
Page 3

being dropped.  We assume that your clients, once apprised of the risks, will see reason and not
pursue the matter further.

     We appreciate your time and attention to this matter.

          Very truly yours,

          Kevin J. Shehan, Esq.

          *Co-Counsel for Plaintiff Marta Bueno*

Cc:    All Counsel of Record (*By Email*)

---

103.    As Plaintiff's June 27th Letter makes clear, Plaintiff sought to resolve the disagreement with Defendants concerning the IME, including that Plaintiff demanded that Defendants drop the matter and discontinue their effort to require Plaintiff to undergo an IME, which, as discussed in the Plaintiff's June 27th Letter, is unnecessary and retaliatory.

104.    In addition, Plaintiff's June 27th Letter, at page 2, points out the Defendants have no basis in the first place to require Plaintiff to undergo an IME, and asserts, at page 3, that "[w]e assume that your clients [the Defendants], once apprised of the risks, will see reason and not pursue the [IME] matter further."

105.    By email dated June 29, 2022 ("Defendants' June 29th Email"), Defendants, though counsel, responded to the Plaintiff's June 27th Letter, dedicating just a single two-sentence paragraph to the unnecessary, retaliatory, baseless effort to require Plaintiff to undergo an IME.

106.    Specifically, as Defendants' June 29th Email stated:

As for the IME issue, we have not yet determined if we will even ask that [Plaintiff] Marta [Bueno] submit to such an examination.  I prefer to let this issue develop in the next couple of months.

107.    The Defendants' June 29th Email is notable for its failure to identify any basis whatsoever for having sought an IME of Plaintiff, and for its lack of any dispute as to Plaintiff's express assertion, in the Plaintiff's June 27th Letter, that the Defendants' intention to require Ms. Bueno to undergo an IME had "no basis."  Nor does Defendants' June 29th Email dispute that the IME would be "unnecessary" and "retaliatory."

108.    A reasonable party, in the position of the Defendants here, when confronted with the assertions that a course of action had "no basis," was "unnecessary," and "retaliatory"—such as seeking to require their adversary to undergo an IME—would have disputed the assertions if they were untrue.  Here, the Defendants, having received Plaintiff's June 27th Letter and having

20

failed to dispute these assertions, thereby made adoptive admissions of the fact that there is "no basis" for the IME, and the fact that it is "unnecessary" and "retaliatory."

109.    The Defendants' June 29th Email is also notable for presenting a shifting rationale regarding the intention to require Plaintiff to undergo an IME.  While the Defendants' June 29th Email demurred that Defendants had "not yet determined if we will even ask that [Plaintiff] Marta [Bueno] submit to such an examination," the Defendants' June 16th Email presents a completely different rationale, namely that Defendants had decided that Plaintiff should undergo an IME and, further, that it should be completed by "September 1, 2022," because Defendants "will want to have this before we take [Plaintiff] Marta's [Bueno's] deposition."  In turn, the Defendants' insistence on the IME, and the parties' disagreement regarding whether Plaintiff should be required to undergo an IME, are memorialized in the parties' Rule 26(f) Report to the Court.  (Doc. 56.)

110.    Despite the mealy-mouthed response set forth in the Defendants' June 29th Email, Plaintiff is not out of the proverbial woods concerning the Defendants' intention to require her to undergo an IME.  Instead, the prospect of undergoing an IME still hangs over her head, like the proverbial Sword of Damocles, waiting to strike at some future moment while Defendants "let this issue [of the IME] develop in the next couple of months."

111.    Accordingly, by email dated June 30, 2022, Plaintiff, through counsel, responded to Defendants' June 29th Email, as follows regarding the IME:

> Regarding the Independent Medical Examination (IME): While Defendants' response below [in Defendants' June 29th Email] is not the one sought by my June 27th letter or hoped for by [Plaintiff] Ms. Bueno, and the parties have not resolved their disagreement, we appreciate your time and attention to the matter.

112.    Defendants' intention to require Plaintiff to undergo an IME, and the Defendants' further maneuver to turn a discovery procedure into a proverbial haunting specter, "develop[ing]"

as the litigation continues, is an unbridled effort to victimize Plaintiff and dissuade her from continuing with the current litigation. As Plaintiff's June 27th Letter observes:

> There are few violations more personal than being subjected, involuntarily, to proverbial poking and prodding into one's mental state by a mental health professional at the behest of one's adversary. As the victim of workplace discrimination, [Plaintiff] Ms. Bueno should not have to face further victimization through the very litigation that she brought to vindicate her rights. In this case, the current effort to require a medical examination [IME] of [Plaintiff] Ms. Bueno is a craven act, perpetrated by the Defendants, apparently done to dissuade [Plaintiff] Ms. Bueno from continuing with this litigation.

113.    In fact, Plaintiff is fearful and horrified by the prospect of being subjected to a baseless, unnecessary, and retaliatory IME by her adversary, especially given that her testimony about her emotional distress would be sufficient during depositions and at trial. Accordingly, Plaintiff feels dissuaded and daunted in her effort, through this lawsuit, to bring Defendants to justice.

114.    It is not speculation that Defendants are using the IME as retaliatory payback for Plaintiff's lawsuit, since Defendants' adoptive admissions and shifting rationales regarding the IME are evidence of pretext for retaliation.

115.    Beyond adoptive admissions and shifting rationales, there is additional evidence of Defendants' retaliatory motives relating to the IME. Specifically, leading up to the mediation of this matter, in March 2022, Defendants, through counsel, asserted falsely and unfairly that Plaintiff's insistence that Defendant Lopez attend mediation—pursuant to applicable mediation rules expressly requiring all parties to attend mediation—was "a transparent effort to harass" Defendant Lopez. Specifically, Defendants, through counsel, stated: "I do not believe the point of plaintiff's insistence that Mr. Lopez attend [mediation] is about improving the chances of settlement. Rather, it is a transparent effort to harass him."

116.    Defendants' cry, through counsel, that it was "harass[ment]" by Plaintiff for Defendant Lopez to be required to attend mediation is telling.  In fact, Rule 9(a) of the applicable mediation procedures, entitled "Attendance at Mediation Sessions," requires that "Each party must attend mediation."  So, for Defendants to blame Plaintiff for that rule, and/or for insisting on the enforcement of that rule, provides a proverbial view directly into Defendants' motivations in their conduct of this litigation and their intent to retaliate against Plaintiff for her supposed "harass[ment]" of Defendant Lopez.  In other words, Defendants' "harass[ment]" statement, among other statements, is relevant to Defendants' intent to confront Plaintiff with some "harass[ment]" of their own, namely a baseless, unnecessary, and retaliatory IME.

117.    It should be noted that, under applicable caselaw, statements made by counsel in the context of settlement discussions are admissible, under Rule 408(b) of the Federal Rules of Evidence, to prove retaliation.  Although, it is equally noteworthy that the "harass[ment]" statement cited above was made during mediation scheduling communications, and not during settlement discussions.  In any event, admissibility is not a consideration at the pleading stage. Additionally, under applicable caselaw, a party's litigation conduct, whether or not during settlement discussions, can give rise to retaliation claims.

118.    Accordingly, Defendants must and, in fairness should, face liability in this case regarding their intention to retaliate against Plaintiff.  Defendants' effort to require Plaintiff to undergo an "unnecessary" and "retaliatory" IME with "no basis" to do so, and, additionally, the continued effort to hold the IME over Plaintiff's head are bare retaliation in its rawest form.

## COUNT I

**VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT, AS AMENDED BY THE PREGNANCY DISCRIMINATION ACT**
*PREGNANCY DISCRIMINATION*

119.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

120.    By the actions described above, among others, the Corporate Defendants violated Title VII of the 1964 Civil Rights Act, as amended by the Pregnancy Discrimination Act ("Title VII"), when they terminated Plaintiff from her employment upon discovering that she was pregnant.

121.    As a direct and proximate result of the Corporate Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of economic damages (including but not limited to lost wages, lost compensation, lost benefits, and out of pocket expenses, in the past and ongoing into the future), punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

122.    As a direct and proximate result of the Corporate Defendants' unlawful conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

## COUNT II

**VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT, AS AMENDED BY
THE PREGNANCY DISCRIMINATION ACT**
***UNLAWFUL RETALIATION***

123.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

124.    By the actions described above, among others, the Corporate Defendants violated Title VII of the 1964 Civil Rights Act, as amended by the Pregnancy Discrimination Act ("Title VII"), when they retaliated against Plaintiff for litigating her pregnancy discrimination claims against them.

125.    As a direct and proximate result of the Corporate Defendants' unlawful retaliation against Plaintiff in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of economic damages (including but not limited to lost wages, lost compensation, lost benefits, and out of pocket expenses, in the past and ongoing into the future), punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

126.    As a direct and proximate result of the Corporate Defendants' unlawful conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

## COUNT III

**VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW**
**N.Y. EXECUTIVE LAW § 290 *ET SEQ.***
***PREGNANCY DISCRIMINATION***

127.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

128.    By the actions described above, among others, the Corporate Defendants violated the NYSHRL, when they terminated Plaintiff from her employment upon discovering that she was pregnant.

129.    As a direct and proximate result of the Corporate Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of economic damages (including but not limited to lost wages, lost compensation, lost benefits, and out of pocket expenses, in the past and ongoing into the future), punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

130.    As a direct and proximate result of the Corporate Defendants' unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

## COUNT IV

**VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW**
**N.Y. EXECUTIVE LAW § 290 *ET SEQ.***
***UNLAWFUL RETALIATION***

131.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

132.    By the actions described above, among others, all Defendants violated the NYSHRL when they retaliated against Plaintiff for litigating her pregnancy discrimination claims against them.

133.    As a direct and proximate result of the Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of economic damages (including but not limited to lost wages, lost compensation, lost benefits, and out of pocket expenses, in the past and ongoing into the future), punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

134.    As a direct and proximate result of the Defendants' unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

## COUNT V

**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW**
**ADMINISTRATIVE CODE § 8-101 *ET SEQ.***
***PREGNANCY DISCRIMINATION***

135.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

136.    By the actions described above, among others, all Defendants violated the NYCHRL, when they terminated Plaintiff from her employment upon discovering that she was pregnant.

137.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of economic damages (including but not limited to lost wages, lost compensation, lost benefits, and out of pocket expenses, in the past and ongoing into the future), punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

138.    As a direct and proximate result of Defendants' unlawful conduct in violation of the NYCHRL, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

## COUNT VI

**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW**
**ADMINISTRATIVE CODE § 8-101 *ET SEQ.***
***AIDING AND ABETTING PREGNANCY DISCRIMINATION***

139.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

140.    By the actions described above, among others, Defendant Lopez Seijas violated the NYCHRL, when he terminated Plaintiff from her employment on account of her pregnancy, which aided and abetted such unlawful conduct of the Corporate Defendants.

141.    As a direct and proximate result of Defendant Lopez Seijas' unlawful and discriminatory conduct in violation of the NYCHRL, which aided and abetted such unlawful conduct of the Corporate Defendants, plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of economic damages (including but not limited to lost wages, lost compensation, lost benefits, and out of pocket expenses, in the past and ongoing into the future), punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

142.    As a direct and proximate result of Defendant Lopez Seijas' unlawful conduct in violation of the NYCHRL, which aided and abetted such unlawful conduct of the Corporate Defendants, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

## **COUNT VII**

**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW**
**ADMINISTRATIVE CODE § 8-101 *ET SEQ.***
***UNLAWFUL RETALIATION***

143.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

144.    By the actions described above, among others, all Defendants violated the NYCHRL when they retaliated against Plaintiff for litigating her pregnancy discrimination claims against them.

145.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of economic damages (including but not limited to lost wages, lost compensation, lost benefits, and out of pocket expenses, in the past and ongoing into the future), punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

146.    As a direct and proximate result of Defendants' unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

## COUNT VIII

**VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW
N.Y. EXECUTIVE LAW § 290 *ET SEQ.*
*AIDING AND ABETTING PREGNANCY DISCRIMINATION***

147.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

148.    By the actions described above, among others, Defendant Lopez Seijas violated the NYSHRL, when he terminated Plaintiff from her employment on account of her pregnancy, which aided and abetted such unlawful conduct of the Corporate Defendants.

149.    As a direct and proximate result of Defendant Lopez Seijas' unlawful and discriminatory conduct in violation of the NYSHRL, which aided and abetted such conduct of the Corporate Defendants, plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of economic damages (including but not limited to lost wages, lost compensation, lost benefits, and out of pocket expenses, in the past and ongoing

into the future), punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

150.    As a direct and proximate result of Defendant Lopez Seijas' unlawful conduct in violation of the NYSHRL, which aided and abetted such unlawful conduct of the Corporate Defendants, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, pre- and post-judgment interest, and such other relief that the Court deems just and proper.

## RELIEF SOUGHT

**WHEREFORE**, Plaintiff requests relief as follows:

A.    An order declaring that the actions of Defendants alleged in this Complaint amount to unlawful discrimination in violation of Title VII, NYSHRL, and NYCHRL;

B.    An order declaring that the actions of Defendants alleged in this Complaint amount to unlawful retaliation in violation of Title VII, NYSHRL, and NYCHRL;

C.    An order enjoining any further acts of retaliation against the Plaintiff and current and former employees of Defendants;

D.    An order mandating implementation and enforcement of an anti-discrimination policy at all of Defendants' hotels;

E.    An award of back pay for Defendants' violations of Title VII, NYSHRL and NYCHRL;

F.    An award of front pay for Defendants' violations of Title VII, NYSHRL and NYCHRL;

G.    An award of compensatory damages in an amount that would fully compensate Plaintiff, plus pre-judgment and post-judgment interest, for the economic loss (including but not

limited to lost wages, lost compensation, lost benefits, and out of pocket expenses, in the past and ongoing into the future), mental anguish and emotional pain and suffering, in the past and ongoing into the future, in an amount to be determined at trial;

H. An award of punitive damages to Plaintiff in an amount that would punish Defendants for the excessive, extreme, willful, wanton, reckless, and negligent misconduct alleged in this Complaint that would effectively deter Defendants from future discrimination, retaliation, and other unlawful behavior, in an amount to be determined at trial;

I. An award of all penalties available under the applicable laws;

J. An award of reasonable attorneys' fees, the fees and costs of experts, the costs of this action, and interest; and

K. Such other relief as this Court deems just and equitable.

## JURY TRIAL

Plaintiff demands a jury trial on all issues properly tried before a jury, including all issues of facts, all issues of mixed law and facts, and all issues of damages.


[Remainder of Page Left Intentionally Blank]

Dated:   New York, New York
        July 20, 2022

Respectfully submitted,

SHEHAN LEGAL, PLLC

*/s/ Kevin J. Shehan, Esq.*

_____

By:    Kevin J. Shehan, Esq.
845 Third Avenue, Ste Sixth Floor
New York, New York 10022
Telephone: 917-740-7805
Email: kevin@shehanlegal.com


CHICKEDANTZ LAW
Maria L. Chickedantz, Esq.
112 Washington Ave., No. 1
Brooklyn, New York 11205
Telephone: 347-699-8784
Email:  maria@chickedantzlaw.com


LAW OFFICES OF PAUL S. HABERMAN LLC
Paul S. Haberman, Esq.
19 Engle Street
Tenafly, New Jersey 07648
Telephone: 201-767-2087
Email: psh@paulhabermanlaw.com

*Attorneys for Plaintiff*