Civ. No. 1:21-cv-00535-MMG-RWL
District Judge Hon. Margaret M. Garnett

**ORAL ARGUMENT
REQUESTED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARTA BUENO,

Plaintiff,

-against-

EUROSTARS HOTEL COMPANY, S.L., FRONT
PROPERTY HOTEL CORPORATION, and
AMANCIO LOPEZ SEIJAS, jointly and severally,

Defendants.

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Stephen Bergstein, Esq.
BERGSTEIN & ULLRICH
5 Paradies Lane
New Paltz, New York 12561
845-419-2250
steve@tbulaw.com

Maria L. Chickedantz, Esq.
CHICKEDANTZ LAW
112 Washington Ave, No. 1
Brooklyn, New York 11201
347-699-8784
maria@chickedantzlaw.com

Kevin J. Shehan, Esq.
SHEHAN LEGAL, PLLC
845 Third Avenue, 6th Floor
New York, New York 10022
917-740-7805
kevin@shehanlegal.com

Paul S. Haberman, Esq.
LAW OFFICES OF PAUL S.
HABERMAN LLC
19 Engle Street, Tenafly,
New Jersey 07670 (All Mail)
88 Pine Street, 22nd Floor
New York, New York 10006
201-564-0590
psh@paulhabermanlaw.com

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ……………………………………………………...…… ii

PRELIMINARY STATEMENT …………………………………………………………. 1

STATEMENT OF FACTS ……..…………………………………………………….. 2

    1.  Plaintiff's employment with Defendants ……………………………………..... 2

    2.  Plaintiff's close relationship with Supervisor Marroqui ……………………………...3

    3.  Plaintiff's leave request and subsequent trip to Barcelona
       and IVF treatments …………………………………………………………………3

    4.  Plaintiff's pregnancy announcement and subsequent termination ……………..……. 10

LEGAL ARGUMENT …………………………………………………………………. 11

    Summary judgment is improper on Plaintiff's pregnancy discrimination claim ………. 11

        Point I: Plaintiff makes out a prima facie case of pregnancy
        discrimination……………………………………………………….…...……… 12

            A.  IVF treatment is protected activity under state, city
               and federal law ……………………………………………...…… 12

            B.  Defendants knew about Plaintiff's IVF treatment prior
               to the decision to terminate her employment ……………………… 13

            C.  Plaintiff was qualified for her position ……………………….….... 16

        Point II: The jury may find that pregnancy discrimination was a
        motivating factor in Defendants' decision to terminate
        Plaintiff's employment …………………………………….…...…………………. 17

        Point III: The jury may find Lopez liable directly and for
        aiding-and-abetting the discrimination that resulted in
        Plaintiff's termination ……………………………………….…….…………… 24

CONCLUSION ……………………………………………………….……….. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page**

*Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107 (2d Cir. 2004) …………. 22-23

*Bart v. Golub Corp.*, 96 F.4th 566, 578 (2d Cir. 2024)………..………………….....…. 15, 17

*Bennett v. Health Mgt. Systems, Inc.*, 92 A.D.3d 29 (1st Dept. 2011)…………………….. 18

*Bueno v. Eurostars Hotel Co.*, S.L., No. 21-CV-535-JGK, 2022 WL 95026
    (S.D.N.Y. Jan. 10, 2022)……………………………………………………………... 25

*Byrnie v. Town of Cromwell, Bd. Of Educ.*, 243 F.3d 93 (2d Cir. 2001)………......……..…... 22

*Carlton v. Mystic Transp. Inc.*, 202 F.3d 129 (2d Cir. 2000)……………………………….. 20

*Charles v. City of New York*, No. 21 CIV. 5567 (JPC), 2023 WL 2752123
    (S.D.N.Y. Mar. 31, 2023) …………………………………………………………… 19

*Chauca v. Abraham*, 841 F.3d 86 (2d Cir. 2016) ……………………………….....……… 12

*EEOC v. Ethan Allen, Inc.,* 44 F.3d 116 (2d Cir. 1994)…………………………………….. 20

*Europe v. Equinox Holdings, Inc.*, No. 20-CV-7787 (JGK), 2022 WL 4124763
    (S.D.N.Y. Sept. 9, 2022)……………………………………………………..……… 19

*Fisher v. Vassar College*, 114 F.3d 1332 (2d Cir. 1997) …………………………………… 18

*Govori v. Goat Fifty, L.L.C.*, No. 10 CIV. 8982 (DLC), 2011 WL 1197942
    (S.D.N.Y. Mar. 30,  2011) ………………………………………………………… 13

*Hall v. Nalco Co.*, 534 F.3d 644 (7th Cir. 2008) ……………………………….....……….
    13
*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134 (2d Cir. 2010) ………………………………... 17

*Infante v. Ambac Fin Grp.*, 03 Civ. 0880 (KMW), 2006 WL 44172
    (S.D.N.Y. Jan. 5, 2006)…………………………………………………………… 12

*Int'l Union, United Auto. v. Johnson Controls, Inc.*, 499 U.S. 187 (1991)……………….….. 13

*King v. Aramark Servs. Inc.*, 96 F.4th 546 (2d Cir. 2024) …………………………………... 24

*Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015) ……………...………………… 12

*Livingston v. City of New York*, 563 F. Supp. 3d 201 (S.D.N.Y. 2021) ……………………… 19

*Mandell v. Cnty. of Suffolk*, 316 F.3d 368 (2d Cir. 2003) ………………………………………… 22

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)……………………………...…… 16

*Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107 (1st Dept. 2012)…...………...……………… 18

*Owens v. New York City Hous. Auth.*, 934 F.2d 405 (2d Cir. 1991) …………………………… 16

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000)………………………………… 18

*Sista v. CDC Ixis N. America, Inc*., 445 F.3d 161 (2d Cir. 2006) ……...……………………… 16

*Thornley v. Penton Pub., Inc.,* 104 F.3d 26 (2d Cir. 1997) ………………………...……… 16

*Walsh v. Nat'l Computer Sys.,* 332 F.3d 1150 (8th Cir. 2003) …………………………….. 13

*Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659 (2d Cir. 2009)…………………………… 20

*Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834 (2d Cir. 2013)……….…………………… 17, 20

**Statutes**                                                                                              **Page**

Title VII, 42 U.S.C. § 2000, *et seq*……………………………………...………………… 12-13

New York State Human Rights Law [N.Y. Exec. Law § 290, *et seq*.]…………..…… 18-19, 24-25

New York City Human Rights Law [N.Y.C. Admin. Code § 8-101, *et seq.*]..…… 12, 18-19, 24-25

**Other Sources**                                                                                        **Page**

New York State Division of Human Rights Guidance on Pregnancy Discrimination ….…..…… 13

## PRELIMINARY STATEMENT

Plaintiff Marta Bueno was a 12-year employee of Defendants' hotels, including for a time as general manager of two New York City properties, until she was fired on February 25, 2020, for no stated reason—none. Bueno asserts that she was fired due to pregnancy discrimination, which includes discrimination on the basis of IVF, under federal, state, and city laws.

As background, Bueno told her supervisor, Cristina Marroqui, in September and December 2019, that she wanted to undergo IVF because she was having trouble getting pregnant after a 2018 ectopic pregnancy. Marroqui responded forebodingly, in sum and substance, "that's nice, but, you know this company . . . Lopez doesn't like people taking leave because it ends up being a cost for the company. He wants employees to work no matter what." On December 26, 2019, Bueno told Marroqui that she needed to travel to her apartment in Barcelona, Spain at the end of January and beginning of February 2020, to handle a tenant matter. Then, on January 3, 2020, Bueno told Marroqui that she planned to undergo IVF in Spain during the apartment-related trip. Defendants dispute most of these facts, which will need to be tried before the jury.

Bueno did travel to Spain in January and February 2020, and she did receive IVF during that apartment-related trip. Those facts are not in dispute. But the jury will need to decide Defendants' factual claim, as made in discovery, that they fired Bueno for a "wholly unauthorized three-week vacation in Barcelona, Spain." Bueno testified credibly at deposition that she believed the leave was approved. Likewise, an internal email shows the Defendants' director of human resources, Marta Sanjurjo, admitting that Bueno appeared to believe the leave was approved. Sanjurjo's email also shows her taking responsibility for confusion around the approval, because she did not follow up with Bueno to deny the leave. "The truth is it was my fault, let me explain," Sanjurjo's email states. The jury may find that the "truth" (to borrow Sanjurjo's term) is:

Defendants' motivations for firing Bueno unlawfully included the fact that she received IVF in Spain, not merely that she traveled there allegedly without authorization.

Moreover, Defendants have provided shifting and contradictory post-hoc explanations that will permit the jury to find that Defendants' claimed justifications for firing Bueno are a pretext for pregnancy discrimination. For example, Defendants testified in depositions that neither Marroqui nor Defendant Lopez were involved in firing Bueno. Yet two separate sets of interrogatory responses—one signed by Lopez and another signed by Sanjurjo—admit that Lopez was the final decision-maker who fired Bueno and that Marroqui was involved. In fact, the evidence shows that Marroqui was meaningfully involved in firing Bueno, contrary to Defendants' denials. For these and other reasons discussed below, summary judgment should be denied.

**STATEMENT OF FACTS**

**1. Plaintiff's employment with Defendants.**

In October 2007, Plaintiff Marta Bueno began working as a Duty Manager in one of Defendants' hotels in Barcelona. (Bueno Dep. [Def. Ex. 137, Doc. 139-55, hereinafter "Bueno Dep."] 54:3-7). Plaintiff was hired by Defendant Amancio Lopez Seijas ("Lopez"). (Plaintiff Decl. ¶ 2). In October 2013, Bueno was transferred to New York City and appointed General Manager for the Eurostars Wall Street Hotel in Manhattan at 129 Front Street. (*Id*. at ¶ 3). Plaintiff's 2013 transfer to New York was a promotion. (Sanjurjo Dep. [Def. Ex. 139, Doc. 139-57, hereinafter "Sanjurjo Dep."], 57:11-22).

Due to her outstanding performance, Plaintiff was again promoted in 2015 by Lopez to the position of Chief Operating Officer ("COO") of Defendants' New York City hotels, including the hotels at 129 Front Street and 52 East 41st Street. (Plaintiff Decl. ¶ 4). In 2017, Bueno was temporarily relocated to Miami to open two Eurostars hotels. (*Id*. at ¶ 5). Later in 2017, Bueno

helped open a Eurostars hotel in Chicago. (*Id.* at ¶ 6).

### 2. Plaintiff's close relationship with Supervisor Marroqui.

In 2018, and while still in New York, Bueno was transferred to the position of Sales Manager in Defendants' Commercial Division, supervised by Cristina Marroqui. (Marroqui Dep. [Def. Ex. 140, Doc. 139-58, hereinafter "Marroqui Dep."], 18:5-7; 18:12:24-13:12; 19:11-15; Sanjurjo Dep., 60:23-61:4; Bueno Dep., 33:20-22; 61:19-62:5). Marroqui and Plaintiff became close friends, as they (a) socialized outside of work (Marroqui Dep., 25:12-18, 27:11-21); (b) often discussed personal matters (Marroqui Dep., 28:23-29:6); (c) had nicknames for each other (Marroqui Dep., 41:22-23; 48:22-49:8; Pl. Ex. 4A [Doc. 139-61] at EU-553); (d) Marroqui borrowed clothing from Plaintiff (Marroqui Dep., 42:20-25; Pl. Ex. 4A [Doc. 139-61] at EU-553); (e) they called each other "my darling" (Marroqui Dep., 51:2-6; 52:6-8; 53:17-20, Pl. Ex. 4A [Doc. 139-61] at EU-552); and (f) Bueno concluded a WhatsApp communication to Marroqui with the word "kisses." (Marroqui Dep., 61:12-15 (Marroqui's translation); *cf.* Pl. Ex. 4A [Doc. 139-61] at EU-559 (Defendants' certified translation: "warm regards"). On a 2018 trip to Boston, Marroqui texted Plaintiff: "I can't wait to see youuu." (Pl. Ex. 4A [Doc. 139-61] at EU-551; Marroqui Dep., 35:20-24). While in Boston together, they socialized and had lunch together at every opportunity. (Marroqui Dep., 40:19-41:7).

In 2018, Bueno suffered the loss of a pregnancy due to an ectopic pregnancy. (Bueno Dep., 32:13-16). Bueno confided in Marroqui about this event (Marroqui Dep., 30:3-7; 132:5-8), and Marroqui told Plaintiff that she could count on Marroqui if she needed to talk, or if she had pregnancy-related issues that "could affect her work." (Marroqui Dep., 56:18–58:16, 60:20-25).

### 3. Plaintiff's leave request and subsequent trip to Barcelona and IVF treatments.

In September 2019, Bueno told Marroqui that she wanted IVF treatments because she was

having difficulties getting pregnant naturally. (Bueno Dep., 229:11-16; Bueno Decl. ¶ 7). Bueno said it was cheaper to receive IVF treatments in Barcelona. (Bueno Decl. ¶ 8). When Plaintiff and Marroqui returned to this discussion in December 2019 (Bueno Dep., 223:14-224:7; 228:5-230:10), Marroqui stated, in sum and substance, "that's nice, but, you know this company . . . Lopez doesn't like people taking leave because it ends up being a cost for the company. He wants employees to work no matter what." (Bueno Decl. ¶ 9).

On December 26, 2019, while on Christmas vacation in Barcelona, Plaintiff emailed a leave request to Marroqui, advising she had to return to Barcelona around January 21, 2020 until February 1, 2020 or soon thereafter to manage a tenant matter. (Pl. Ex. 11A, attached to the Declaration of Maria Chickedantz. Esq. ["Chickedantz Decl."] ¶ 3, at EU-1066).

On January 3, 2020, Bueno told Marroqui that her IVF treatment in Barcelona would commence later that month, to coincide with the trip relating to her tenant vacating the apartment. (Bueno Decl. ¶ 10). During this conversation, Marroqui acted annoyed with Bueno over her plans to become pregnant and eventually take maternity leave. (Bueno Decl. ¶ 11).

On January 4, 2020, Marroqui responded by email, asking Bueno, "How many unused vacation days do you have from 2019??" (Pl. Ex. 11A, Chickedantz Decl. ¶ 3, at EU-1066). Bueno said she had 13 days of accrued unused vacation. *(Id.)* Ten days later, Marroqui emailed Plaintiff, writing that in 2019, Bueno took 29 days off, so it was unclear why Bueno thought she had 13 days of vacation remaining. (Pl. Ex. 17A, Chickedantz Decl. ¶ 5, at EU-577). In response, Bueno detailed how some of her days off in 2019 were from accrued 2018 vacation days, and concluding she had eleven remaining vacation days from 2019. (*Id.* at EU-576-77). Also on January 14, 2020, Marroqui forwarded Bueno's email (about having eleven days of accrued vacation) to Marta Sanjurjo, the director of human resources, (Def. Memo. at 2), asking, "Can you confirm for me

that this is the case?" (Def. Ex. 114A [Doc. 139-19] at EU-1461).

On January 16, 2020, Plaintiff began taking estrogen in preparation for her IVF procedure. (Bueno Dep., 126:21-127:2; Bueno Decl. ¶ 12). That day, as a follow-up to her December 26, 2019 leave request, Plaintiff emailed Marroqui: "I'm going to book the plane and the most economical flight has me leaving on January 27 and returning on February 6, spending every vacation day for 2019." (Pl. Ex. 14A [Doc. 139-63] at EU-1333). Also on January 16, 2020, Marroqui forwarded Plaintiff's email (about reserving airfare for January 27 through February 6) to Sanjurjo, stating, "I need to know how to proceed with this vacation of Marta Bueno." *(Id.)* Marroqui acknowledged at deposition that she forwarded this email to Sanjurjo for guidance on how to proceed. (Marroqui Dep., 84:6-12). Later that day, Marroqui wrote back to Bueno, stating, "I've again asked the DG and Marta [Sanjurjo]. They've told me they would tell me something today." (Pl. Ex. 15A, Chickedantz Decl. ¶ 4, at EU-1468); (Sanjurjo Dep., 110:21-25 ("DG" is a Spanish abbreviation for "general directors").

On January 17, 2020, Marroqui forwarded to Sanjurjo the January 14, 2020 email from Bueno about her eleven accrued vacation days, and Sanjurjo responded, "I see it, but it's still not correct," and detailed how Bueno only had four days left for 2019, stating, "Perhaps she'll understand if you put it that way . . . ." (Pl. Ex. 17A, Chickedantz Decl. ¶ 5, at EU-576).

On January 20, 2020, as management was still trying to determine how many days of accrued vacation were available to her, Bueno emailed Sanjurjo, copying Marroqui: "Cristina [Marroqui] tells me that I should send you an email explaining the issue of the unused vacation days. Here are the details." (Pl. Ex. 18A, Chickedantz Decl. ¶ 6, at EU-581). Plaintiff detailed why there was a discrepancy of seven days in 2019, which had to do with Defendants requiring Bueno to cancel a vacation and remain in New York to cover for another employee; and that she had 21

unused days from 2018, partly due to a medical issue that barred her from travelling. (*Id.* at EU-581-82).

Later that day, on January 20, 2020, Marroqui forwarded the email from Bueno (explaining to Sanjurjo that she had accrued vacation days from 2018) to Teresa Jimenez—the supervisor to whom Bueno had reported in 2018 (Sanjurjo Dep., 88:3-11; 89:16-20), and Bueno's former "Area Manager" (*id*. at 101:15-19)—stating, "We have a discrepancy in the vacation days of Marta Bueno for 2018, and Marta Sanjurjo tells me I should ask you what medical situation arose in 2018 as a result of which Marta was unable to take her vacation time." (Pl. Ex. 18A, Chickedantz Decl. ¶ 6, at EU-581).

The next day, Jimenez responded by email to Marroqui: "Yes, she was in fact hospitalized on the day she was due to catch the plane. I am aware that she sent an email explaining the situation to Marta [Sanjurjo]. Ultimately she couldn't take it because they prohibited her from flying. I also remember that I reconfirmed with her that I had discussed it with you." (*Id.*) Marroqui forwarded Jimenez's email to Sanjurjo. (*Id.*)

Shortly thereafter, Sanjurjo responded to Marroqui:

Can you ask Terry to share with you the vacation time she actually did take in 2018? I know it to be the case that Marta reported not having been able to catch the plane because she was sick, and that she later asked to take those vacation days from October 8 to 21, but it doesn't seem normal to me for her not to have informed you in early 2019 that she did in fact have unused vacation days. If she had unused days, wouldn't it be logical for her to take them over Christmas 2018? Vacation time can't be carried over in this way.

(*Id.* at EU-580).

Also on January 21, 2020, in response to Marroqui's email request, Jimenez responded to Marroqui and Sanjurjo by email:

The requests I have are for 14 days from August 13 to 26, being those that were put back to October and that were the two weeks that were owed from 2017. In addition to those 14 days that could not be taken in August, she took an additional week in

October from October 1 to 7.

From what I've been able to read in an email on which I was copied, she completed her vacation time for 2018 with a week that you (Cristina) authorized for her from July 1 to 7, 2019. From that point I don't recall what happened. I know she had to return to Spain and postpone her vacations because she had to return to NY so Pablo could go to Chicago.

(*Id.*)

On January 22, 2020, Sanjurjo wrote comments within the text of the January 20, 2020 email from Bueno (explaining why she had accrued vacation days from 2018), and forwarded it to Marroqui and Jimenez, commenting, "I see that this topic is even more complicated. Let's see if we can reconstruct this. I've inserted my comments in red." (Pl. Ex. 19A, Chickedantz Decl. ¶ 7, at EU-583). Within the text of Bueno's email, Sanjurjo highlighted the sections where Bueno explained that she had accrued days from 2018, and said, "*This is where the problem lies."* (Pl. Ex. 19A, Chickedantz Decl. ¶ 7, at EU-584 (emphasis in original)).

Bueno went to Barcelona on January 26, 2020, with the understanding that she had management's authority to take her requested leave. (Bueno Dep., 81:1-13; 93:4-6; 100:17-101:16; 103:3-8; Marroqui Dep., 87:5-6; Bueno Decl. ¶ 13). On January 27, 2020, Plaintiff began the IVF process in Barcelona. (Bueno Dep., 126:21-127:2; Bueno Decl. ¶ 14). On February 2, 2020, Bueno sent an email to Marroqui stating, "I just wanted to remind you that I am in Barcelona because of the issue with my apartment so you won't get my commercial report as I obviously could not make any visits." (Pl. Ex. 26A [Doc. 139-71] at EU-2050). On February 3, 2020, Marroqui wrote, "Do you have the ok for these days?" (Pl. Ex. 26A [Doc. 139-71] at EU-2049–50). Bueno responded, "I told you that I needed to come in advance and a few weeks ago I told you the days and you told me you would send it to GM[.] I thought that using vacation days would be the easiest way but if not tell me what would be best[.]" (*Id.* at EU-2049). In turn, Marroqui responded, "But if Marta

Sanjurjo has not told you anything after all the exchanged emails and you know that vacations must always be authorize by your supervisor after the ok from GM. . . . Since when are you in Spain?" (*Id.*) Bueno responded, "ok I've been here for 1 week." (*Id.*)

In the evening of February 3, 2020, Marroqui emailed her weekly commercial report to Lopez. Her report included the following: "*Marta Bueno: claimed not submitted.*" (Pl. Ex. 22A [Doc. 139-69] at EU-872) (emphasis in original).

On February 4, 2020, as part of her IVF procedure, Bueno's embryo was transferred. (Bueno Dep., 128:7-10; Bueno Decl. ¶ 15.) Also on February 4, 2020, Marroqui forwarded the February 3 email exchange between herself and Bueno (about Bueno's presence in Spain) in separate emails to both Sanjurjo and Lopez (Pl. Ex. 26A [Doc. 139-71] at EU-2048), and Lopez' executive assistant, Judith Gonzalez, forwarded the email to Sanjurjo,[1] and asked, "Did you authorize these vacation days for Marta Bueno?" *(Id.)* Sanjurjo responded, "I'll explain it to you later." (*id.*), to which Gonzalez responded, "The boss is asking!" (*Id.* at EU-2047). "The boss" refers to Lopez. (Sanjurjo Dep., 121:14-18).

Later that day, February 4, 2020, Sanjurjo emailed Lopez and addressing his assistant Gonzalez, wrote:

> The truth is it was my fault, let me explain . . .
>
> Marta asked Cristina for these days because she had to come to Barcelona for some issues related to papers for the apartment and she wanted to take advantage of the fact that, she said, she had vacation days pending.
>
> The fact is that when I told the boss he didn't understand why she didn't take her vacation during Christmas, but the fact is she did take a vacation in December ... we had to rebuild the days that she had really enjoyed because they didn't add up (Cristina had only 4 days pending) and it turns out that what we hadn't taken into account the fact that when she was on her approved vacation last year (from May

---

[1] Sanjurjo testified that Judith Gonzalez was Lopez' executive assistant. (Sanjurjo Dep., 120:3-12).

27 to June 9) we made her return to New York on June 2 because we sent Pablo to Chicago)

The problem is I was commenting this with Cristina and I should have talked to Marta to tell her that the days were correct but it was not the best time for her to take them but I didn't ... however, Marta didn't ask again if it was ok (I suppose that as she sent me an email to explain the days that were missing she believed that was enough). I finally found out she was in Barcelona yesterday ...

I'm sorry

Best regards
Marta

(Pl. Ex. 26A [Doc. 139-71] at EU-2047 (certified translation); *accord* Sanjurjo Dep., 123:6–124:18 (witness translation)).

On February 6, 2020, Bueno emailed Marroqui advising that she would have to delay her return to New York from February 6 until February 13, and would return to work on February 14. (Def. Ex. 116A [Doc. 139-23] at EU-591). Marroqui responded: "I was very surprised by this email because actually you are in Spain without the definitive approval of Marta Sanjurjo, who I am copying for her records." (*Id.*)

On February 10, 2020, in response to a request for work-related documents, Bueno emailed Coordinator of International Commercial Department Sofie Vandeweyer, copying Marroqui, advising that she was in Spain until Thursday for a personal matter, and that she would return to work on Friday and provide the documents at that time. (Pl. Ex. 30A [Doc. 139-73] at EU-1674). Marroqui forwarded the email to Sanjurjo, stating, "In the end, how should we proceed with Marta [Bueno]. I'm not sure if you've had the chance to discuss it with Mr. Lopez or if you've managed to speak with her?" (*Id.*) Later that day, Marroqui emailed her weekly commercial report to Lopez, including the following: "*Marta Bueno: unauthorized absence in Spain.*" (Pl. Ex. 31A, Chickedantz Decl. ¶ 8, at EU-882 (emphasis in original)).

On February 11, 2020, Marroqui forwarded the February 10 email chain to Patricia Cereijo,

Defendants' Chicago hotel manager (Bueno Dep., 71:3-5), stating, "I sent this email to Marta Sanjurjo yesterday because, to be honest, I don't know how we're going to proceed with Marta Bueno … No one has responded to me yet." (Pl. Ex. 32A [Doc. 139-75] at EU-1680–81). Cereijo responded, "I honestly don't understand anything . . . " (*Id.* at EU-1680.) Marroqui responded, "She's in Spain until Thursday, and I still don't know anything."). (*Id.*)

 Bueno returned to New York on February 13, 2020. (Bueno Dep., 104:21-105:2). The next day, Plaintiff learned that the IVF treatments had been successful and that she was pregnant. (Bueno Dep., 158:5-10).

### 4. Plaintiff's pregnancy announcement and subsequent termination.

On February 18, 2020, Carla Isbert of the Law Department dispatched Cereijo to New York to inform Bueno that her employment was terminated. Isbert's email attached a termination letter that provided no reason for Plaintiff's termination. (Pl. Ex. 43A [Doc. 139-79] at EU-300).

According to Defendants' Response No. 9 in each of their three sets of interrogatory responses, Lopez was the only individual with authority to terminate Plaintiff's employment. (Exs. 49-51, Chickedantz Decl. ¶¶ 11-13).[2] But Lopez did not act alone. According to Defendants' Response No. 11 in their interrogatory responses, Lopez, Sanjurjo and Marroqui were all involved in the decision to terminate Bueno's employment. (*Id.*) While Lopez was the ultimate decisionmaker, according to Defendants' interrogatory Response No. 9, Marroqui played a meaningful role in that she informed Lopez by email to his assistant on February 4, 2020, that Bueno had taken an unauthorized vacation in Spain (Pl. Ex. 26A [Doc. 139-71] at EU-2048), informed Lopez again in her February 10, 2020 report (Pl. Ex. 31A, Chickedantz Decl. ¶ 8, at EU-

---

[2] Notably, Sanjurjo signed Defendants' Interrogatory responses served on October 6, 2023, (Pl. Ex. 50, Chickedantz Decl. ¶ 12), while Lopez signed Defendants' Interrogatory responses served on November 17, 2023 (Pl. Ex. 51, Chickedantz Decl. ¶ 13).

882), and referred Plaintiff for termination. (Sanjurjo Dep., 33:8-18; 34:15-35:5; 53:13-16).

On February 20, 2020, Plaintiff advised Marroqui that the IVF had been successful and that she was pregnant. (Bueno Dep., 204:16-22; Bueno Dec. ¶ 16). A few days later, on February 23, 2020, in an email to Lopez, Cereijo advised that she would go to New York the following week to terminate Bueno's employment. (Pl. Ex. 40A, Chickedantz Decl. ¶ 6, at EU-4626 and EU-4637). Without any justification from Defendants, Plaintiff was fired on February 25, 2020. (Def. Ex. 127 [Doc. 139-40] at MB-13; Bueno Decl. ¶ 17).

## LEGAL ARGUMENT

### Summary judgment is improper on Plaintiff's pregnancy discrimination claim.

"In determining whether the moving party is entitled to judgment as a matter of law, or whether instead there is sufficient evidence in the opposing party's favor to create a genuine issue of material fact to be tried, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" *Kaytor v. Elec. Boat Corp*., 609 F.3d 537, 545-46 (2d Cir. 2010). Put another way, "[s]ummary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit, for the court in considering such a motion 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" *(Id.)* Relatedly, "[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate. . . . In sum, summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, 'there can be but one reasonable conclusion as to the verdict.'" (*Id*. at 546). The district court's summary judgment order is reviewed *de novo*. (*Id.*)

**Point I**

**Plaintiff makes out a *prima facie* case of pregnancy discrimination.**

To make out a *prima facie* case of pregnancy discrimination, "the plaintiff does not need substantial evidence of discriminatory intent. If she makes a showing (1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation, then she has satisfied the *prima facie* requirements and a presumption of discriminatory intent arises in her favor, at which point the burden of production shifts to the employer, requiring that the employer furnish evidence of reasons for the adverse action." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) (emphasis in original).

"At this stage, a plaintiff seeking to defeat a defendant's motion for summary judgment would not need evidence sufficient to sustain her ultimate burden of showing discriminatory motivation, but could get by with the benefit of the presumption if she has shown evidence of the factors entitling her to the presumption." (*Id.*)

**A.  IVF treatment is protected activity under state, city, and federal law.**

Defendants recognize that termination on the basis of an employee's IVF treatment "is a form of pregnancy discrimination." (Def. Mem. at 3). Title VII protects individuals from discrimination on the basis of "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Relatedly, "Pregnancy discrimination is a form of gender discrimination under the NYCHRL." *Chauca v. Abraham*, 841 F.3d 86, 90 n.2 (2d Cir. 2016). As such, "the PDA prohibits an employer from discriminating against a woman "because of her capacity to become pregnant." *Infante v. Ambac Fin Grp.*, 03 Civ. 0880 (KMW), 2006 WL 44172, at *5 (S.D.N.Y. Jan. 5, 2006) (further holding that a pregnancy-related medical condition is protected under Title VII, quoting

*Int'l Union, United Auto. v. Johnson Controls, Inc.,* 499 U.S. 187, 206 (1991), and citing *Walsh v. Nat'l Computer Sys.,* 332 F.3d 1150, 1160 (8th Cir. 2003) ("Plaintiff asserts that she was discriminated against . . . because she is a woman who had been pregnant, had taken a maternity leave, and might become pregnant again. 'Potential pregnancy . . . is a medical condition that is sex-related because only women can become pregnant'"). As the Seventh Circuit has stated:

> Employees terminated for taking time off to undergo IVF -- just like those terminated for taking time off to give birth or receive other pregnancy-related care -- will always be women. This is necessarily so; IVF is one of several assisted reproductive technologies that involves a surgical impregnation procedure. Thus, contrary to the district court's conclusion, Hall was terminated not for the gender-neutral condition of infertility, but rather for the gender-specific quality of childbearing capacity.

*Hall v. Nalco Co.*, 534 F.3d 644, 648-49 (7th Cir. 2008); *see also Govori v. Goat Fifty, L.L.C.*, No. 10 CIV. 8982 (DLC), 2011 WL 1197942, at *3 (S.D.N.Y. Mar. 30, 2011) ("An employer who fires his female employee for missing work for IVF treatment discriminates not on the basis of reproductive capacity or infertility alone, but on the basis of medical conditions related to pregnancy. Thus, women who are fired for undergoing IVF are protected from such discriminatory, sex-based action by the terms of the PDA"); New York State Division of Human Rights Guidance on Pregnancy Discrimination ("Treating *pregnancy-related conditions* differently from other medical conditions is also disability discrimination. Furthermore, the Human Rights Law was amended . . . to make explicit that employers are required to provide *reasonable accommodation of pregnancy-related conditions*. Employers' obligation to provide reasonable accommodation applies to all needs and restrictions related to an employee's pregnancy") (emphasis in original).

### B. Defendants knew about Plaintiff's IVF treatment prior to the decision to terminate her employment.

Defendants argue that Plaintiff cannot prove a *prima facie* case because they decided to

terminate her employment on February 18, 2020, before they learned that Plaintiff was pregnant on February 20, 2020. (Def. Mem. at 8, 9-12). While Defendants largely claim they were unaware of Plaintiff's *pregnancy* when they decided to fire her, Defendants barely touch upon their knowledge that Plaintiff was undergoing *IVF treatment*, and when they learned about her efforts to become pregnant, addressing this point as an afterthought. *See id*. at 12.

Plaintiff's case turns on the retaliation that followed her conversation with Marroqui that she would be undergoing IVF treatment, a pregnancy-related activity protected under Title VII and the State and City HRL's. As they had a close friendship, Plaintiff, having previously suffered an unsuccessful pregnancy (Bueno Dep., 32:13-16; Marroqui Dep., 29:25–33:22), shared this information with Marroqui in September and December 2019. (Bueno Dep., 229:11-16; 223:14-224:7; 228:5-230:10; Bueno Decl. ¶ 7). Moreover, while Plaintiff's email to Marroqui, dated December 26, 2020, stated she was flying to Barcelona to handle a tenant matter (Def. Ex. 114), Plaintiff.'s declaration confirms that she verbally told Marroqui on January 3, 2020 that she would be receiving IVF treatment in Barcelona. (Bueno Decl. ¶ 10). There is no contradiction between Plaintiff's deposition and her declaration. At deposition, Plaintiff was asked:

> Q. What was the actual reason why you wanted to go back to Spain during this period?
>
> MR. SHEHAN:  Objection to form.
>
> A. I had to handle the changing of the tenant in the apartment.
>
> Q. Any other reason?
>
> A. *This was the reason for which I requested these days*.

(Def. Ex. 137 [Doc. 139-55], at 91:13-21) (emphasis supplied).

Plaintiff's testimony that she articulated this reason *in writing* does not preclude her stating in a sworn declaration that she *verbally* told Marroqui that she was also going to Barcelona for

IVF treatment. Bear in mind that when Plaintiff told Marroqui in December 2019 that she would undergo IVF treatment, Marroqui responded, "that's nice, but, you know this company . . . Lopez doesn't like people taking leave because it ends up being a cost for the company. He wants employees to work no matter what." (Bueno Decl. ¶ 9). The inference is that Plaintiff omitted any reference to IVF treatment in her email to Marroqui to avoid Lopez's wrath.

The jury may credit Plaintiff's sworn testimony, through her declaration, as logical. She and Marroqui were close friends, and they would naturally discuss her IVF treatment. Marroqui testified that they discussed Plaintiff's pregnancy issues. When asked how Plaintiff could count on her, Marroqui answered, "If you need to talk, know that you can count on me. If she has a personal problem, then she can count on me, so that way she can focus and she can focus on work." (Marroqui Dep. 58:2-6). When asked if trying to get pregnant was among the things Plaintiff could discuss with her, Marroquo answered, "If that's something that would affect her work, then she could talk to me about it to try to help her, so that way it wouldn't affect her or the company. But at any time she said to me that she wasn't pregnant or that she didn't want to be pregnant or she wanted to stay pregnant or that she was pregnant in 2020." (*Id.*) The reasonable inference is that Plaintiff shared her pregnancy issues with Marroqui. As Marroqui was a supervisor in Defendants' commercial division (Statement of Facts § 2), was in regular contact with management (*id.* at § 4), and Sanjurjo admitted that Marroqui referred Plaintiff for termination (Sanjurjo Dep., 33:8-18; 34:15-35:5; 53:13-16), Marroqui's knowledge of Plaintiff's IVF—and her discriminatory animus—is imputed to Defendants. "A Title VII plaintiff can succeed on a discrimination claim against an employer even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the decision-making process." *Bart v. Golub Corp.*, 96 F.4th 566, 578 at n. 4 (2d Cir. 2024)

(citations omitted).

### C. Plaintiff was qualified for her position.

Defendants next argue that Plaintiff cannot make out a *prima facie* case because she did not perform her duties satisfactorily. (Def. Mem. at 13-14). In support of this argument, Defendants argue that management had asked Plaintiff to do "better" and to "improve" her performance and that she received negative reviews. (Def. Mem. at 13). This argument misunderstands the *prima facie* inquiry.

"*McDonnell Douglas* requires only a minimal showing of qualification to establish a *prima facie* claim. Owens only needs to demonstrate that she 'possesses the basic skills necessary for performance of [the] job.'" *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991). In *Sista v. CDC Ixis N. America, Inc*., 445 F.3d 161 (2d Cir. 2006), the Court of Appeals reiterated "the analytical distinction between (i) qualification for a job and (ii) disqualification arising from a legitimate, non-discriminatory, reason for an adverse employment decision," noting that:

> We have no doubt that ... misconduct may certainly provide a legitimate and non-discriminatory reason to terminate an employee. This misconduct is distinct, however, from the issue of minimal qualification to perform a job. An individual may well have the ability to perform job duties, even if her conduct on the job is inappropriate or offensive. Accordingly, the finding of misconduct here cannot preclude [the plaintiff] from showing her qualification for employment as required by *McDonnell Douglas.*

*Id*. at 171-72 (citing *Thornley v. Penton Pub., Inc.,* 104 F.3d 26 (2d Cir. 1997) (clarifying *Owens* and stating that "[t]he point of our ruling was that 'misconduct' . . . did not [necessarily] correspond to the question of satisfactory performance" and that "*Owens* did not depart from our holdings that a plaintiff complaining of discriminatory discharge shows 'qualification' by demonstrating satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance, as some other courts had erroneously read it to").

16

As Plaintiff began working for Defendants in 2007, the jury may easily find that she possessed the qualifications for her position. That she was not terminated until 2020, coincident with Defendants' knowledge about her IVF treatments, further supports the argument that her termination would not have happened prior to that event.

## Point II

**The jury may find that pregnancy discrimination was a motivating factor in Defendants' decision to terminate Plaintiff's employment.**

"In proving a case under Title VII, following the defendant's proffer of a justification, a plaintiff need only show that the defendant was in fact motivated . . . by the prohibited discriminatory animus. . . . A plaintiff has no obligation to prove that the employer's innocent explanation is dishonest, in the sense of intentionally furnishing a justification known to be false. The crucial element of a claim under Title VII is discrimination, not dishonesty." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010); *see also Bart*, 96 F.4th at 570-76 ("A plaintiff . . . need only show that the employer's stated reason—even if true or factually accurate—was not the 'real reason,' in the sense that it was not the entire reason due to a coexisting impermissible consideration). To demonstrate pretext, "plaintiff may rely on evidence comprising [her] *prima facie* case, . . . together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013).

"'The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.' Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial

evidence that is probative of intentional discrimination, and it may be quite persuasive. . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).

The City Human Rights Law offers greater protections than federal law and must be construed "as liberally as reasonably possible in favor of plaintiffs." *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 127 (1st Dept. 2012). "The plaintiff should prevail in an action under the NYCHRL if he or she proves that unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision." (*Id.*) As such, courts should be wary of granting summary judgment in City HRL cases. "We recognize that there has been a growing emphasis on using summary judgment in discrimination cases to promote 'judicial efficiency.' But at least in the context of the City HRL, the Restoration Act provides a clear and unambiguous answer: a central purpose of the legislation was to resist efforts to ratchet down or devalue the means by which those intended to be protected by the City HRL could be most strongly protected. These concerns warrant the strongest possible safeguards against depriving an alleged victim of discrimination of a full and fair hearing before a jury of her peers by means of summary judgment." *Bennett v. Health Mgt. Systems, Inc.*, 92 A.D.3d 29, 44 (1st Dept. 2011).

The First Department endorses a broad model of proving disparate treatment, finding that "the maximum deterrent effect sought by the City HRL can only be achieved where covered entities understand that, whatever the urge may be to cover up their actual motivations before arriving in court, there can be no benefit for doing so once in court." *Id.* at 43. Rather than adopt federal standards, which allow the employer in some cases to prevail even if the plaintiff was fired for pretextual reasons, *see Fisher v. Vassar College*, 114 F.3d 1332, 1339 (2d Cir. 1997), under the

18

City law, plaintiffs may prevail if *any* of the employer's reasons are a pretext. *Bennett*, 92 A.D.3d at 43-44. The Appellate Division departs from the federal model because the latter "did not sufficiently consider factors crucial to interpreting the City HRL in a way that is 'uniquely broad and remedial.'" *Id*. at 42.

In 2019, "the NYSHRL was amended in order to construe the NYSHRL, like the NYCHRL, 'liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed.'" *Europe v. Equinox Holdings, Inc.*, No. 20-CV-7787 (JGK), 2022 WL 4124763, at *7 n.10 (S.D.N.Y. Sept. 9, 2022). "While New York courts have not yet produced any substantive analysis of how this amendment changes standards of liability under the NYSHRL, courts in this District have interpreted the amendment as 'render[ing] the standard for claims closer to the standard of the NYCHRL,' which contains similar language mandating liberal construction 'regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed.' The Court therefore considers Charles's NYCHRL and NYSHRL claims together." *Charles v. City of New York*, No. 21 CIV. 5567 (JPC), 2023 WL 2752123, at *6 (S.D.N.Y. Mar. 31, 2023) (quoting *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021), and N.Y.C. Admin. Code § 8-130(a)).

Defendants argue that they terminated Plaintiff's employment because of her job performance. Defendants also argue that Plaintiff took unauthorized vacation time and was not performing her duties satisfactorily. (Def. Mem. at 16). The jury may deem both justifications a pretext for pregnancy discrimination.

First, Defendants' claim that Plaintiff failed to perform her duties properly -- grounded in

their November 4, November 18, and December 12, 2019 written performance critiques -- is a shifting, *post-hoc* explanation that permits a finding of pretext. *See Zann Kwan,* 737 F.3d at 847 ("Kwan's evidence of Andalex's inconsistent explanations for her termination and the very close temporal proximity between her protected conduct and her termination are sufficient to create a triable issue of fact with regard to whether the September 3 complaint was a but-for cause of her termination"); *Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 663 (2d Cir. 2009) (summary order) ("Weiss contends that pretext can be inferred from JPMorgan's shifting explanations for his termination. Inconsistent or even post-hoc explanations for a termination decision may suggest discriminatory motive") (citing *Carlton v. Mystic Transp. Inc.,* 202 F.3d 129, 137 (2d Cir. 2000); *EEOC v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2d Cir. 1994)).

While the written critiques predated Defendants' knowledge of Plaintiff's IVF treatments, it was not until they learned about her pregnancy issues that Defendant terminated her employment. At no point prior to the IVF treatments did Defendants warn Plaintiff that she was facing possible termination. They simply wanted Plaintiff to improve her job performance. (Def. Ex. 106, 107, 108, 109). Exhibit 106 shows Lopez's routine feedback (in caps) about Plaintiff's performance. Exhibit 107, an email from Marroqui, asked Plaintiff "to be more aggressive with account renewals . . . and recruit those that we analyze in cumulative terms. Marroqui's other comments in this email constitute routine feedback without any sense of urgency. The same holds true for Exhibit 108: Lopez offered a single non-urgent comment as feedback to Plaintiff's report for the week of January 6-10, 2020. Exhibit 109 is a supportive message from Marroqui, thanking Plaintiff for her continuous efforts but offering constructive criticism for the upcoming year. Again, Marroqui provided no indication that Plaintiff's job was in jeopardy.

The jury may find that this excuse for Plaintiff's termination is an after-the-fact justification

that no one articulated to her when she was fired, and which Defendants did not set forth in their initial interrogatories when asked to explain the reasons for this adverse action. On August 16, 2022, Defendants said, in their Response to Information Request "c." of their responses to Pilot Project Regarding Initial Discovery Protocols for Employment Cases Alleging Adverse Action, that Bueno was terminated for taking a "wholly unauthorized three-week vacation in Barcelona, Spain." (Pl. Ex. 48, Chickedantz Decl. ¶ 10). This position was reiterated in Marroqui's April 4, 2024 deposition testimony. (Marroqui Dep., 66:3-5). On April 10, 2024, Sanjurjo testified that Bueno was terminated for not seeking leave approval from Marroqui. (Sanjurjo Dep., 135:19-136:2). Marco Orru, who supervised Plaintiff for a short period prior to her termination, testified that Bueno was fired because she did not obtain vacation approval from the "head office." (Orru Dep. [Def. Ex. 141, Doc. 139-59, hereinafter "Orru Dep."], 19:18-22). Lopez testified that Bueno abandoned her post without authorization and without communicating with anyone for weeks. (Lopez Dep. [Pl. Ex. 59, Chickedantz Decl. ¶`4, hereinafter "Lopez Dep."], 28:9-11; 41:5-17). The jury may find Defendants' claim that they fired Plaintiff because of her alleged performance deficiencies was intended to bolster their defense after-the-fact to avoid liability.

Defendants' other justification -- that Plaintiff was absent without leave -- fares no better. The record demonstrates genuine confusion among her supervisors as to how much paid time off was available to Plaintiff. This confusion is best proven through Sanjurjo's email to Lopez, written when Plaintiff's superiors were trying to make sense of her absence from the office. Sanjurjo began her email as follows: "The truth is it was my fault, let me explain." (Pl. Ex. 26A [Doc. 139-71] at EU-2047). After running through the sequence of events and the basis for this confusion, she concluded, "The problem is I was commenting this with Cristina and I should have talked to Marta to tell her that the days were correct but it was not the best time for her to take them but I didn't."

*(Id.)* Sanjurjo's admission that this confusion was her fault and that she did not discuss this matter with Plaintiff permits the inference that the paid time-off issue extended far beyond any alleged misconduct by Plaintiff due to the mistakes of her superiors.

Moreover, while Defendants claim that Bueno abandoned her post without authorization and without communicating with anyone for weeks (Def. Mem. at 18; Lopez Dep., 28:9-11; 41:5-17), emails produced by Defendants, as well as testimony from their witnesses, demonstrate that Bueno was in communication with her supervisors and working while in Barcelona. (Marroqui Dep., 98:10-99-2; Orru Dep., 94:5-8; 96:16-97:4; 98:3-8; 99:20-25). Defendants' witnesses were unable to identify any written policy that Bueno violated as the basis for her termination. (Lopez Dep., 41:18-42:25; Marroqui Dep., 96:15-19; Sanjurjo Dep. *see*, *e.g*., 114:5-117:22). To that effect, Lopez stated, "This decision was made based on the norms that we uphold in this company. Now, whether it was written or unwritten, that is irrelevant." (Lopez Dep., 43:20-23). Lopez went on to testify: "Not everything has to be written to be understood in any company around the world. For example, the terms of slavery are not written, the rules against it are not in writing, but everyone knows that it's wrong. So in this case, for me, the facts are clear. [. . . ] The act of murder is not in writing either." (Lopez Dep., 42:2-16).

The jury may look askance at Defendant's subjective, unwritten "policy." *Compare Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003) ("We have previously cautioned that an employer may not rely solely on wholly subjective and unarticulated standards as a basis for its promotion decisions") (citing *Byrnie v. Town of Cromwell, Bd. Of Educ.,* 243 F.3d 93, 104 (2d Cir. 2001)). Lopez made his stereotyped views of women clear during his deposition by stating: "when we hire young women, we know that they will eventually likely become mothers." (Lopez Dep., 133:21-134:2). This stereotypical thinking further taints Plaintiff's termination. *See Back v.*

*Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 117-122 (2d Cir. 2004) (comments that stereotype mothers as insufficiently committed to their jobs constitute evidence of gender discrimination).

The jury may also consider Defendants' shifting explanations about leave approval. In the first two iterations of Defendants' responses and objections to Plaintiff's interrogatories, Defendants asserted that "[o]nly Amancio Lopez Seijas was authorized to approve or reject employees' requests for leave." (Defendants' Responses and Objections to Plaintiff's First Interrogatories, respectively dated June 21, 2023 and October 6, 2023, Response No. 12). But on November 17, 2023, they asserted that leave requests were to go through a program called "Success Factors." (Defendants Second Amended Responses and Objections to Plaintiff's First Interrogatories, dated November 17, 2023, Response No. 12). At deposition, Marroqui testified that leave requests "needed to be authorized through a platform, . . . authorized by General Management, and then they have to be notified by me." (Marroqui Dep., 89:5-9). She also testified that Lopez had final say in "verifying" leave requests. (*Id*., 89:18-90:3; 91: 19-23: 92:6-13). Yet, Sanjurjo testified that only Marroqui had authority to approve Bueno's leave. (Sanjurjo Dep., 52:16-24; 53:13-16). Sanjurjo also testified that Bueno's calculation of the amount of accrued vacation days she had prior to taking her leave in Barcelona was correct. (Sanjurjo Dep., 127:23-128:4).

Relatedly, in assessing whether Defendants offered pretextual reasons for Plaintiff's termination, the jury may consider Defendants' shifting explanations about *who* terminated Bueno. As noted above, Defendants identified Lopez as the only individual authorized to terminate Plaintiff's employment. (Defendants' Responses and Objections to Plaintiff's Interrogatories, dated June 21, 2023, October 6, 2023, and November 17, 2023, Response No. 9). Defendants'

witnesses testified that Marroqui and Sanjurjo are Lopez's subordinates, in that they answer to him. (Marroqui Dep., 12:21-23; Sanjurjo Dep., 26:5-9). But, on August 16, 2022, they asserted that the decision to terminate Bueno was taken jointly by *four* people: Lopez, Marroqui, Sanjurjo, and Carla Isbert. (Defendants' Responses to Pilot Project Regarding Initial Discovery Protocols for Employment Cases Alleging Adverse Action, dated August 16, 2022). Yet, as discussed above, Defendants in all three versions of their responses to Plaintiff's interrogatories asserted that the decision to terminate Bueno was taken jointly by *three* people: Lopez, Marroqui, and Sanjurjo. And, Sanjurjo testified that she was the sole decision-maker in Bueno's termination. (Sanjurjo Dep., 33:8-15; 36:13-19). Moreover, while Marroqui claimed she was not involved in the decision to fire Bueno (Marroqui Dep., 17:13-18), Sanjurjo admitted that Marroqui referred Plaintiff for termination. (Sanjurjo Dep., 33:8-18; 34:15-35:5; 53:13-16). For his part, Lopez testified that Sanjurjo authorized Bueno's termination (Lopez Dep., 26:10-15), denied his own involvement (*id*. at 27:16:17), and disclaimed any knowledge about Marroqui's involvement. (*Id*. at 27:8-15).

As the Second Circuit has held, "To show pretext, a plaintiff can point to 'weaknesses, implausibilities, inconsistencies, or contradictions in' an employer's offered reason for its adverse action. Also probative are whether the employee believed the conduct was permissible and any procedural irregularities." *King v. Aramark Servs. Inc.*, 96 F.4th 546, 565 (2d Cir. 2024). Viewing the record in the light most favorable to Plaintiff, the jury may recognize the multitude of inconsistencies and implausible justifications advanced by Defendants for the termination of her employment. Summary judgment on Plaintiff's pregnancy discrimination claim is improper.

### Point III

### The jury may find Lopez liable directly and for aiding-and-abetting the discrimination that resulted in Plaintiff's termination.

Defendants recognize that the State and City HRL's authorize personal liability against

decisionmakers who aid and abet discriminatory conduct. (Def. Mem. at 19). In addition to aiding-and-abetting liability, "individual employees may incur liability for their own discriminatory conduct" under the City HRL. *Bueno v. Eurostars Hotel Co.*, S.L., No. 21-CV-535-JGK, 2022 WL 95026, at *7 (S.D.N.Y. Jan. 10, 2022). Defendants argue, however, that Lopez cannot be found individually liable, because Plaintiff cannot prove a *prima facie* case of discrimination. However, as demonstrated above, the jury may find otherwise. Should that happen, then Lopez may be liable under the State and City HRL's.

## CONCLUSION

This Court should deny the motion for summary judgment and set this case down for trial.

Dated: New York, New York
November 23, 2024

Respectfully submitted,

/s/ *Stephen Bergstein*
Stephen Bergstein, Esq.
BERGSTEIN & ULLRICH
5 Paradies Lane
New Paltz, New York 12561
845-469-1277
steve@tbulaw.com

/s/ *Maria L. Chickedantz*
Maria L. Chickedantz, Esq.
CHICKEDANTZ LAW
112 Washington Ave, No. 1
Brooklyn, New York 11201
347-699-8784
maria@chickedantzlaw.com

/s/ *Kevin J. Shehan*
Kevin J. Shehan, Esq.
SHEHAN LEGAL, PLLC
845 Third Avenue, 6th Floor
New York, New York 10022
917-740-7805
kevin@shehanlegal.com

/s/ *Paul S. Haberman*
Paul S. Haberman, Esq.
LAW OFFICES OF PAUL S.
HABERMAN LLC
19 Engle Street, Tenafly,
New Jersey 07670 (All Mail)
88 Pine Street, 22nd Floor
New York, New York 10006
201-564-0590
psh@paulhabermanlaw.com

*Attorneys for Plaintiff*