UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARTA BUENO,

                                        *Plaintiff,*                    1:21-cv-00535-MMG-RWL

            -against-

EUROSTARS HOTEL COMPANY, S.L., FRONT
PROPERTY HOTEL CORPORATION, and
AMANCIO LOPEZ SEIJAS, jointly and severally,

                                        *Defendants.*

### PLAINTIFF'S RESPONSE TO DEFENDANTS' FED. R. CIV. P. 56 AND LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Plaintiff Marta Bueno ("Plaintiff" or "Bueno") hereby submits the following response to "Defendants' Fed. R. Civ. P. 56 and Local Rule 56.1 Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried":

1.      Marta Bueno ("Plaintiff" or "Ms. Bueno") is an adult woman who, at times relevant to the Complaint, has resided in New York City. Plaintiff was born in Spain on April 23, 1978, and is 46-years old. Second Amended Complaint dated July 20, 2022 ("Compl."), at ¶¶ 11-12, ECF#62.

**RESPONSE**: Undisputed.

2.      Defendant Eurostars Hotel Company, S.L. ("Eurostars") is a Spanish company that was incorporated under the name of Agincourt 2008, S.L., and which changed its name in November 2016 to its current name. Compl. ¶ 14, ECF#62. Eurostars performs hotel management services for a conglomerate of companies known in Spanish as Grupo Hotusa pursuant to management contracts between the respective hotel operating companies and

1

Eurostars. Declaration of Alfred Nieto dated June 11, 2024 ("Nieto Decl."), at ¶ 6, ECF#118.

**RESPONSE**: Undisputed.

3.        Non-party Hoteles Turísticos Unidos, S.A. ("Hoteles Turísticos") is the parent

company of the conglomerate of companies known in Spanish as "Grupo Hotusa." Hotusa is an

acronym derived from the name Hoteles Turísticos Unidos S.A. Grupo Hotusa is not the legal

name of any one company. This name is used to describe the entire group of companies. Nieto

Decl. ¶ 3, ECF#118.

**RESPONSE**: Undisputed.

4.        Grupo Hotusa's core business is the operation of hotels. The group owns some

hotels, but most of the group's hotels are leased (in each case via a special purpose vehicle set up

for that purpose). For Grupo Hotusa's hotels in countries other than Spain, these special purpose

vehicles are set up by local counsel, taking into account the laws and regulations of the relevant

jurisdiction. Each such local entity is in charge of managing the hotel that it owns or leases and

assumes all the rights and obligations arising from contracts and agreements concluded with any

third party (owner/lessor, suppliers, financial institutions, etc.). Each local entity also receives

the income derived from hotel operations and pays the expenses generated by those operations at

its own risk. Nieto Decl. ¶ 4, ECF#118.

**RESPONSE**: Undisputed.

5.        Defendant Front Property Hotel Corporation ("Front Property Corp."), a New

York Corporation, operates one hotel in New York City located at 129 Front Street, New York,

New York, 10005. Compl. ¶ 18, ECF#62.

**RESPONSE**: Undisputed.

6.        Non-party 129 Front Hotel LLC, a New York limited liability company wholly

owned by non-party Hoteles Turísticos, is the sole shareholder of Front Property Corp. Ex. A
(Grupo Hotusa Corporate Organizational Chart), ¶ 8, ECF#118.

> **RESPONSE**: Undisputed.

7. Defendant Amancio López is a Spanish citizen and resident of Barcelona, Spain.
Declaration of Amancio López dated July 2, 2021 ("López Decl."), at ¶ 23, ECF#24. More than
40 years ago, Mr. López started a hotel and tourism business which became known as Grupo
Hotusa. *Id. at ¶ 3*. Mr. López is the CEO of Front Hotel Corp. and the sole administrator of
Eurostars. *Id. at ¶ 2*.

> **RESPONSE**: Undisputed, although Bueno notes that, consistent with this assertion,
> Lopez was the only individual with authority to terminate Plaintiff's employment. *See*
> Defendants' three separate sets of Responses and Objections to Plaintiff's Interrogatories,
> respectively dated June 21, 2023, October 6, 2023, and November 17, 2023, Response
> No. 9 (Pl. Exs. 49–51, Chickedantz Decl. ¶¶ 11-13). Moreover, Defendants have also
> asserted in their interrogatory Response No. 12 that "[o]nly Amancio Lopez Seijas was
> authorized to approve or reject employees' requests for leave." (Pl. Exs. 49–50,
> Chickedantz Decl. ¶¶ 11-12). Cristina Marroqui also testified that Lopez had final say in
> "verifying" leave requests. (Marroqui Dep. 89:18-90:3; 91: 19-23: 92:6-13).

8. Non-party Cristina Marroquí is a Spanish citizen and resident of Sevilla, Spain.
Declaration of Cristina Marroquí dated June 14, 2021 ("Marroquí Decl."), at ¶ 6, ECF#26. At the
times relevant in the Second Amended Complaint, Ms. Marroquí was employed by Eurostars as
international sales manager. *Id. at ¶ 2*. In her role as international sales manager, Ms. Marroquí
was tasked with overseeing various executives at different companies of the group, which
operate various Eurostars hotels, including Front Hotel Corp. In that capacity, Ms. Marroquí

supervised Marta Bueno from 2018 until her termination in February 2020. *Id.* at ¶ 2. Ms.

Marroquí was dismissed from this case in January 2022. (Mem. Op. & Order, Jan. 7, 2022,

ECF#46).

> **RESPONSE**: Undisputed, although Bueno notes that Marroqui played a meaningful role
> in the termination of Bueno's employment, as well as her role in approving Plaintiff's
> leave request. According to Defendants' interrogatory Response No. 11, Lopez, Sanjurjo
> and Marroqui were involved in the decision to terminate Bueno's employment. (Exs. 49-
> 51, Chickedantz Decl. ¶¶ 11-13).   While Lopez was the ultimate decisionmaker,
> according to Defendants' interrogatory responses (*Id.*, Response No. 9), Marroqui played
> a meaningful role in that she informed Lopez by email to his assistant on February 4,
> 2020, that Bueno had taken an unauthorized vacation in Spain (Pl. Ex. 26A [Doc. 139-71]
> at EU-2048), informed Lopez again in her February 10, 2020 report (Pl. Ex. 31A,
> Chickedantz Decl. ¶ 8, at EU-882), and referred Plaintiff for termination. (Sanjurjo Dep.,
> 33:8-18; 34:15-35:5; 53:13-16).

9.     Non-party Marta Sanjurjo is the head of human resources of Hoteles Turísticos. In

that capacity, Ms. Sanjurjo oversees all of the human resources aspects of all subsidiaries of

Hoteles Turísticos, which includes 7000 employees employed by approximately 300 different

companies that are part of Grupo Hotusa. Declaration of Marta Sanjurjo dated June 12, 2024

("Sanjurjo Decl."), at ¶ 5, ECF#120. Ms. Sanjurjo has worked for Hoteles Turísticos for over 35

years and has been the head of human resources since 2008. *Id. at ¶ 2*.

> **RESPONSE**: Undisputed.

10.     Non-party Marco Orru is a Director of Sales for Defendant Eurostars in charge of

the U.K. and U.S. markets. Deposition of Marco Orru dated April 3, 2024 ("Orru Dep."), at 31:5-

12. Mr. Orru first worked at Eurostars in 2007. Orru Dep. 28:20. Mr. Orru subsequently worked for a series of hospitality companies and finally started to work for Eurostars again in January 2020. Orru Dep. 20:13.

**RESPONSE**: Undisputed, although Bueno notes that Orru was also one of Plaintiff's supervisors at the time of her termination of employment with Defendants. Orru Dep. 53:18-21; 54:16-55:9.

11.    Non-party Patricia Cereijo was in charge of a hotel in Chicago that is part of Grupo Hotusa. Deposition of Marta Bueno dated April 12, 2024 ("Bueno Dep."), at 71:3-5. Ms. Cereijo informed Ms. Bueno of her termination on February 25, 2020. Bueno Dep. 71:11-15; 72:8-15; 213:13-18.

**RESPONSE**: Undisputed.

12.    Non-party Keith Gorla, a 48-year-old male, is Ms. Bueno's husband. Deposition of Keith Gorla dated April 8, 2024 ("Gorla Dep."), at 28:21-22; 29:10-11.

**RESPONSE**: Undisputed.

13.    Ms. Bueno was initially hired as a duty manager in 2007 by World Trade Center Hotel, S.L., which operates and does business as the Hotel Eurostars Grand Marina Hotel in Barcelona, Spain. López Decl. ¶14, ECF#24; Bueno Dep.; Def. Ex. 105, Marta Bueno's Resume, at MB-00035. In or around the fall of 2013, Ms. Bueno was transferred to New York to work as a general manager at the Eurostars Wall Street Hotel. Def. Ex. 131, Letter signed by Mr. López assigning Ms. Bueno to a new post at Eurostars Wall Street in New York; Compl. ¶ 33, ECF#62. In her capacity as hotel general manager, Ms. Bueno was aware of and prepared the Front Hotel Employee handbook. Bueno Dep. 82:7-8.

**RESPONSE**: Undisputed.

14.      In April 2014, Ms. Bueno obtained a J1 Visa. Def. Ex. 132, E-2 Visa Application of Marta Bueno. Ms. Bueno's J-1 visa was eventually converted to a treaty investor visa and she became an employee of Front Corp. in New York, which company employed her through her termination on February 25, 2020. *Id.*; Bueno Dep. 213:10-214:9; Def. Ex. 127, Termination Letter, at MB000013; Compl. ¶¶ 81-82, ECF#62.

**RESPONSE**: Undisputed.

15.      When she left Eurostars in February 2020, Ms. Bueno held the position of Sales Manager for the Eurostars Wall Street Hotel in New York City. Bueno Dep. 33:20-34:3. This was an in-person position, in which she was responsible for bringing in business from local companies to the Eurostars Wall Street Hotel. Bueno Dep. 54:17-55:20; 57:3-22; Orru Dep. 56:16-22; 57:13-22. Ms. Bueno discharged her responsibilities by making weekly visits (on average 5 or 6) to companies that could potentially book rooms in the Eurostars Wall Street Hotel. Bueno Dep. 58:2-59:10. These visits were later memorialized in Ms. Bueno's weekly reports and later in a report for the month. Bueno Dep. 57:3-22; 109:2-112:14.

**RESPONSE**: Disputed to the extent that Bueno was also able to perform some of her duties remotely. Emails produced by Defendants, as well as testimony from their witnesses, demonstrate that Bueno was in communication with her supervisors and working while on leave in Barcelona. (Marroqui Dep., 98:10-99-2; Orru Dep., 94:5-8; 96:16-97:4; 98:3-8; 99:20-25).

***Ms. Bueno was aware that she was required to obtain the written authorization of her supervisor for all vacation time.***

16.      In her previous position of general manager of Eurostars Wall Street, Ms. Bueno helped to draft the Eurostars Wall Street Employee Handbook. Bueno Dep. 82:2-8. *See* Email dated March 23, 2019, from Marta Bueno to Patricia Cereijo, Def. Ex. 110.(FN1) Ms. Bueno

6

testified that she was aware of the vacation and time-off policies for Eurostars Wall Street that

are set out in the handbook. Bueno Dep. 68:21-69:1.

> Footnote 1: Exhibit 110, which was used during Ms. Bueno's deposition, is
> comprised of the email from Ms. Bueno enclosing the Eurostars Wall Street
> Employee Handbook and the Eurostars Wall Street Employee Handbook. The
> other attachments were omitted from this exhibit. Exhibit 136 represents the same
> email but it contains all the attachments to the email.

**RESPONSE**: Undisputed.

17.    Ms. Bueno testified that the vacation rules set out in the employee handbook

applied to her, but that she was allowed four weeks of vacation instead of three. Bueno Dep.

77:3-78:2.

**RESPONSE**: Undisputed.

18.    With respect to paid vacations, Section 3.3 of the Employee Handbook(FN2)

provides, in relevant part:

> After twelve (12) months of continuous service, non-exempt full-time staff
> members will be eligible to take two (2) weeks' vacation. In subsequent years of
> employment, only earned vacation days may be taken and paid. Because we want
> you to have time off, pay will not be given in lieu of vacation.
>
> In order to anticipate work loads, you must schedule vacation leave in advance.
> The Hotel will make every effort to accommodate your vacation request.
> However, business needs as well as the vacation schedules and length of service
> of other staff members will dictate when you can take your vacation, which will
> be given to staff members via a written notice.
>
> Questions of priority with regard to the vacation schedule are to be resolved on a
> first-come, first served basis, except in conflict situations. An example of a
> conflict situation would be one in which an individual each year requests vacation
> time during the holiday season, resulting in others being denied the opportunity to
> take vacation during the holiday season. Even though an individual submits an
> early vacation request, this request may be later denied to provide the opportunity
> to others to take vacation during the holiday season. We encourage you to plan
> your vacation well in advance, as vacation schedules are prepared early in the
> year.
>
> *Vacation leave must be requested in writing and approved by your supervisor.*

While it should be recognized that it is not always possible to schedule vacations at the same time that you desire, every effort will be made to do so.

Length of service Vacation Entitlement
1-2 Years 2 weeks
3 - 5 Years 3 weeks
6 or more Years 4 weeks

(Emphasis added.)

Footnote 2: Def. Ex. 110 at Eurostars004750-4751, emphasis added.

**RESPONSE**: Undisputed.

19.    Ms. Bueno testified under oath that she was aware of and understood the handbook's provisions relating to vacation leave, including the requirement that any requests be made in writing and approved by supervisors. Bueno Dep. 80:13-21. Ms. Bueno also admitted that the requirement that she obtain previous written authorization for vacation leaves applied to her. When questioned whether she was aware that the vacation needed to be approved in writing she responded:

BY MS. RIBEIRO:

*Q. But you're aware that your vacation needed to be approved in writing by your supervisor, correct?*

MR. SHEHAN: Objection to form.

*A.  Correct. I made this document, so I'm fully aware of this.*

Bueno Dep. 82:2-8 (emphasis added). Ms. Sanjurjo also testified to the existence of these policies. Deposition of Marta Sanjurjo dated April 10, 2024 ("Sanjurjo Dep."), at 114:6-25.

**RESPONSE**: Undisputed.

20.    As a sales manager, Ms. Bueno was responsible for bringing business from companies to the Eurostars Wall Street Hotel. Bueno Dep. 54:22-55:16. Ms. Bueno also admitted during her deposition that her position required her to work in person and that she was unable to

perform her job remotely as her job was essentially one that required her to visit clients locally. Bueno Dep. 58:9-59-7.

> **RESPONSE**: Disputed to the extent that Plaintiff was also able to perform some of her duties remotely. Emails produced by Defendants, as well as testimony from their witnesses, demonstrate that Bueno was in communication with her supervisors and working while in Barcelona. (Marroqui Dep., 98:10-99-2; Orru Dep., 94:5-8; 96:16-97:4; 98:3-8; 99:20-25).

21.    Ms. Bueno knew that she was required to submit her vacation requests through Success Factors, a web-based platform launched by Grupo Hotusa in 2019 to manage employee vacation requests and approvals. Bueno Dep. 81:20-83:18. In fact, on or around November 14, 2019, Ms. Bueno wrote to her supervisor to seek instructions on how to make a request for vacation via Success Factors. *See* Bueno Dep. 82:6-83:13; Def. Ex. 111, Email dated November 14, 2019, from Ms. Marroquí to Ms. Bueno.

> **RESPONSE**: Disputed to the extent that this paragraph suggests that a written policy existed in early 2020 requiring employees of Defendants to request leave via Success Factors. Defendants' witnesses were unable to identify any written policy that Bueno violated as the basis for her termination. (Lopez Dep., 41:18-42:25; Marroqui Dep., 96:15-19; Sanjurjo Dep. *see*, *e.g*., 114:5-117:22). To that effect, Lopez stated, "This decision was made based on the norms that we uphold in this company. Now, whether it was written or unwritten, that is irrelevant." (Lopez Dep., 43:20-23). Lopez went on to testify: "Not everything has to be written to be understood in any company around the world. For example, the terms of slavery are not written, the rules against it are not in writing, but everyone knows that it's wrong. So in this case, for me, the facts are clear. [.

9

. . ] The act of murder is not in writing either." (Lopez Dep., 42:2-16).

***Ms. Bueno's poor performance***

22.      As sales manager, Ms. Bueno's performance was below expectations and she received negative feedback on her performance on multiple occasions. Ms. Bueno admitted that Ms. Marroquí wanted her "to do [ ] better." Bueno Dep. 63:14-19; Def. Exs. 106, 107, 108, 109, Emails dated November 4 and 18, 2019, December 20, 2019, and January 13, 2020, from Ms. Marroquí to Ms. Bueno about her performance as a sales manager.

> **RESPONSE**: Disputed to the extent that any of the feedback in question is deemed
>
> evidence of "poor performance." About Ms. Marroquí's feedback in general, Bueno
>
> testified, "I don't see any criticism. What I see is that she is guiding me to improve my
>
> work." Bueno Dep. 63:10-11. Moreover, Bueno's other supervisor Marco Orru, testified
>
> about her job performance, "She had very good feedback." Orru Dep. 72:14. Orru also
>
> testified "Marta understood the strategy, the new strategy. She was great catching up, so
>
> very good line." Orru Dep. 72:17-19. Orru also described Bueno's due diligence work as
>
> "amazing" (Orru Dep. 93:2-6).

23.      For example, on November 4, 2019, in response to Ms. Bueno's mandatory weekly report, Ms. Marroquí stated, "We have already discussed it many times and actually in the report to DG, we only have to highlight that which is purely business. We need to be more aggressive with account renewals, Marta, and recruit those that we analyze in cumulative terms." Bueno Dep. 63:21-64:10; Def. Ex. 107.

> **RESPONSE**: Disputed to the extent that the feedback in question is deemed evidence of
>
> "poor performance." About Ms. Marroqui's November 4, 2019 feedback, Ms. Bueno
>
> testified:

Q. Does this refresh your recollection as to whether or not she criticized the quality – she criticized your sales reports?

MR. SHEHAN: Objection to form.

A. No, I don't see any criticism. As I said, I think that she is guiding me for me to do it better.

BY MS. RIBEIRO:

Q. So she was providing you with constructive feedback?

A. Yes, in this one specifically, I was not able to make certain visits because I twisted my ankle.

Bueno Dep. 64:10-22. Moreover, Ms. Bueno's other supervisor, Orru, testified about her job performance, "She had very good feedback." Orru Dep. 72:14. Orru also testified, "Marta understood the strategy, the new strategy. She was great catching up, so very good line." Orru Dep. 72:17-19. Orru also described Bueno's due diligence work as "amazing" (Orru Dep. 93:2-6).

24.    On November 18, 2019, Ms. Marroquí commented on Ms. Bueno's report stating, "[p]lease improve," and "[y]ou should have indicated who you have contacted since this week you have *barely done* any external actions." Bueno Dep. 63:2-19; Def. Ex. 106.

**RESPONSE**: Disputed to the extent that the feedback in question is deemed evidence of "poor performance." About Ms. Marroqui's November 18, 2019 feedback, Bueno testified "I don't see any criticism. What I see is that she is guiding me to improve my work." Bueno Dep. 63:10-11. Moreover, Bueno's other supervisor, Orru, testified her job performance during his deposition, "She had very good feedback." Orru Dep. 72:14. Orru also testified, "Marta understood the strategy, the new strategy. She was great catching up, so very good line." Orru Dep. 72:17-19. Orru also described , Bueno's due diligence work as "amazing" (Orru Dep. 93:2-6).

11

25.    On December 20, 2019, Ms. Marroquí reiterated her concerns about Ms. Bueno's performance stating, "I need you to be more commercially aggressive by 2020 and to recruit new company accounts for the hotel that, *as we discussed, we need to improve*. It is also very important that you know your hotel numbers, occupation rates, average prices, the budget to be obtained marked by revenue... you must be more analytical in that regard. . . . you just need to get organized and prioritize. Try to be more organized and focused. . . . I hope your goals for the New Year all come true!!!!" Def. Ex. 109 (emphasis added); Bueno Dep. 65:11-67:18. Ms Bueno testified that she knew Ms. Marroquí wanted her to improve, be more aggressive and get new accounts. Bueno Dep. 67:12-18

    **RESPONSE**: Disputed to the extent that the feedback in question is deemed evidence of "poor performance." About Ms. Marroqui's December 20, 2019 feedback, Bueno testified "… what I see in this – what I read in this e-mail is that she is wishing me a Merry Christmas. She's thanking me for my work. And she is giving me feedback and information to improve my work." Bueno Dep. 67:9-13. Moreover, Bueno's other supervisor, Orru (Orru Dep. 74:3-8), testified about her job performance during his deposition, saying "She had very good feedback." Orru Dep. 72:14. Orru also testified, "Marta understood the strategy, the new strategy. She was great catching up, so very good line." Orru Dep. 72:17-19. Orru also described Bueno's due diligence work as "amazing" (Orru Dep. 93:2-6).

26.    Again, on January 13, 2020, Ms. Marroquí provided negative comments on Ms. Bueno's report. Bueno Dep. 65:1-9; Def. Ex. 108. Ms. Bueno admitted that Ms. Marroquí was giving her guidance to improve. Bueno Dep. 65:1-4.

    **RESPONSE**: Disputed to the extent that the feedback in question is deemed evidence of

"poor performance." *See above*, responses to ¶¶ 22-25.

***Ms. Bueno's December 23-January 3 vacation request is authorized***

27.    On November 22, 2019, through the Success Factors platform Ms. Bueno

requested authorization to take vacation from December 23, 2019, until January 3, 2020. *See*

Def. Ex. 112, Screenshot of Success Factors platform showing Ms. Bueno's November 22, 2019,

vacation request. Ms. Bueno testified at her deposition that she indeed sought vacation during the

period between December 23, 2019, and January 3, 2020, through Success Factors and that Def.

Ex. 112 represented that request. Bueno Dep. 85:8-21; 87:15-22. Ms. Bueno's request to take

vacation from December 23, 2019, to January 3, 2020, was approved by Ms. Marroquí, her

supervisor, on November 27, 2019. *See* Bueno Dep. 88:5-22; Deposition of Cristina Marroquí

dated April 4, 2024 ("Marroquí Dep."), at 95:4-12; Def. Ex. 113, November 27, 2019, approval

screen by Ms. Marroquí. Ms. Bueno admitted that she took this vacation. Bueno Dep. 88:5-89:7.

    **RESPONSE**: Undisputed.

***Ms. Bueno seeks additional time off from January 27 through February 6, 2020, but does not receive authorization from her supervisor or anybody else***

28.    In addition to her vacation from December 23, 2019, to January 3, 2020, Ms.

Bueno sought to take more time off in January 2020. Bueno Dep. 89:8-11. On December 26,

2019, Ms. Bueno emailed Ms. Marroquí and told her that she would need to go back to Spain to

deal with logistical issues concerning the transition of a new tenant into an apartment she owned

in Barcelona and that she would like to use vacation time she said she had left over from prior

years. Bueno Dep. 89:12-93:21. *See* Def. Ex. 114, Email dated December 26, 2019, from Ms.

Bueno to Ms. Marroquí, at Eurostars001462. In her email, Ms. Bueno did not request any

specific days off, but simply said she would like to return to Barcelona for a period of time in

January. *Id.*

**RESPONSE**: Disputed to the extent that Defendants consider Bueno's December 26, 2019 email to Marroqui anything other than a written request to take leave. That day, Bueno emailed this leave request to Marroqui, advising she had to go to Barcelona around January 21, 2020 until February 1, 2020 or soon thereafter to manage a tenant matter. (Pl. Ex. 11A, Chickedantz Decl. ¶ 3, at EU-1066).

29.    Ms. Marroquí questioned Ms. Bueno's calculation of vacation days carried over from prior years and escalated the matter to Marta Sanjurjo, the head of Human Resources. Def. Ex. 114. Ms. Marroquí did not authorize Ms. Bueno's request to take more time off in January.

**RESPONSE**: Disputed. Defendants' witness, Sanjurjo, admitted in an email to Lopez that Bueno was under the impression that her leave was authorized:

> The problem is I was commenting this with Cristina and I should have talked to Marta to tell her that the days were correct but it was not the best time for her to take them but I didn't ... however, Marta didn't ask again if it was ok (I suppose that as she sent me an email to explain the days that were missing she believed that was enough)

Pl. Ex. 26A [Doc. 139-71] at EU-2047; *accord* Sanjurjo Dep., 123:6–124:18 (witness translation). , Bueno also believed she had approval to take the leave. Bueno Dep., 81:1-13, 93:4-6; 100:17-101:16; 103:3-8.

30.    Ms. Bueno again asked Ms. Marroquí about her request on January 16, stating that she was planning to leave on January 27 and return on February 6. Sanjurjo Dep. 76:7-77:25, Pl. Ex. 14, Email dated January 16, 2020, from Ms. Sanjurjo to Ms. Marroquí about Ms. Bueno's request for vacation. The request was outside the standard procedure as Ms. Bueno had already taken her vacation for the year, so Ms. Marroquí escalated the matter to Ms. Sanjurjo. Sanjurjo Dep. 53:17-54:4; 54:18-56:4; 76:25-77:21.

**RESPONSE**: Undisputed.

31.     While Ms. Bueno was not required to do so, she nevertheless explained to Ms. Marroquí that the reason she needed to return to Barcelona in January was to deal with a new tenant. She did not mention that she was going to undergo IVF treatments there. Bueno Dep. 91:19-92:6; Marroquí testified that Ms. Bueno did not tell her that her leave in January and February would include her receiving IVF treatments, nor was Ms. Sanjurjo aware. Marroquí Dep. 78:2-15, Sanjurjo Dep. 66:5-67:7. During her deposition, in fact, Ms. Bueno testified that she only provided the need to perform work on her apartment as a reason. Bueno Dep. 91:7-21.

**RESPONSE**: Disputed. Bueno advised Marroqui of her plans to undergo IVF treatments in September 2019, specifically advising Marroqui that she wanted IVF treatments because she was having difficulties getting pregnant naturally. (Bueno Dep., 229:11-16; Bueno Decl. ¶ 7). During this conversation, Bueno advised Marroqui that it was cheaper to receive IVF treatments in Barcelona. (Bueno Decl. ¶ 8). A few months later in December 2019, Plaintiff returned to this discussion with Marroqui (Bueno Dep., 223:14-224:7; 228:5-230:10), and Marroqui stated, in sum and substance, "that's nice, but, you know this company . . . Lopez doesn't like people taking leave because it ends up being a cost for the company. He wants employees to work no matter what." (Bueno Decl. ¶ 9).

32.     During her deposition, when questioned if she submitted her second vacation request through the Success Factors portal, Ms. Bueno stated that she did not remember. Bueno Dep. 93:15-17.82. She also testified that she did not know of any documents showing that her vacation request had been approved this time. Bueno Dep. 93:4-13. Mr. Orru testified that Ms. Bueno told him that "with or without authorization I will go to Spain." Orru Dep. 83:8-9; 76:9-78:9;79:17-81:24; 82:3-83:24; 86:5-25.

**RESPONSE**: Undisputed.

33.     There is no dispute that Ms. Bueno did not obtain prior written authorization for her unauthorized stay, as she admitted was a requirement set out clearly in the employee handbook. In fact, when questioned whether Ms. Marroquí had approved her vacation request, Ms. Bueno testified that "she understood that she did." Bueno Dep. 101:1-104:10. When questioned whether anyone at Hotusa had approved her second vacation request either orally or in writing, she testified that "she did not remember," finally claiming that her vacation request was approved tacitly. Bueno Dep. 103:10-104:10. Ms. Bueno admitted that this supposedly "tacit" approval of Ms. Bueno's vacation request was not in accordance with Eurostars' policies and was a deviation from the standard procedure. Bueno Dep. 104:11-18.

**RESPONSE**: Disputed. Sanjurjo admitted in an email to Lopez that Bueno was under the impression that her leave was authorized:

> The problem is I was commenting this with Cristina and I should have talked to Marta to tell her that the days were correct but it was not the best time for her to take them but I didn't ... however, Marta didn't ask again if it was ok (I suppose that as she sent me an email to explain the days that were missing she believed that was enough).

Pl. Ex. 26A [Doc. 139-71] at EU-2047; *accord* Sanjurjo Dep., 123:6–124:18 (witness translation). Bueno also believed she had approval to take the leave. Bueno Dep., 81:1-13, 93:4-6; 100:17-101:16; 103:3-8.

This paragraph is also disputed to the extent that it suggests that Defendants regarded Plaintiff's leave as a violation of any written policy. During their depositions, Defendants' witnesses were unable to identify any written policy that Bueno violated as the basis for her termination. (Lopez Dep., 41:18-42:25; Marroqui Dep., 96:15-19; Sanjurjo Dep. *see*, *e.g.*, 114:5-117:22). To that effect, Lopez stated, "This decision was made based on the norms that we uphold in this company. Now, whether it was written or

unwritten, that is irrelevant." (Lopez Dep., 43:20-23). Lopez went on to testify, "Not everything has to be written to be understood in any company around the world. For example, the terms of slavery are not written, the rules against it are not in writing, but everyone knows that it's wrong. So in this case, for me, the facts are clear. [. . . ] The act of murder is not in writing either." (Lopez Dep., 42:2-16).

***Ms. Bueno goes to Spain without telling Ms. Marroquí, tells Ms. Marroquí she would return on February 14 (instead of February 6), and ignores Ms. Marroquí's warning***

34.      Ms. Bueno testified that her second vacation request was for the period between January 27 through February 6. *See* Bueno Dep. 93:18-96:1; *see* Def. Ex. 115, Email dated January 16, 2020, from Cristina Marroquí to Marta Sanjurjo. It is undisputed that Ms. Bueno did not returned to her job in New York on February 6. Ms. Bueno admitted in her deposition that she only returned to New York on February 13, 2020. Bueno Dep. 100:9-16; *see* Def. Ex. 134.

**RESPONSE**: Undisputed.

35.      On February 2, 2020, while already in Barcelona without authorization, Marta Bueno informed Ms. Marroquí by email that she was unable to deliver her weekly report because she was in Spain. Ms. Marroquí questioned Ms. Bueno whether she had received authorization to be in Spain, and finally for how long she had been in Spain. Pl. Ex. 26, Email dated February 4, 2020, from Marta Sanjurjo to Presidencia, at Eurostars002050. Ms. Marroquí then escalated the matter of Ms. Bueno's unauthorized vacation to both Ms. Sanjurjo and Grupo Hotusa's President, Mr. López. On February 4, 2020, Mr. López's assistant then asked Ms. Sanjurjo what she would do with respect to Ms. Bueno. *Id*. *See also* Sanjurjo Dep. 107:20-112:20; 120:21-124:25. It is clear therefore that since at least February 3, Ms. Bueno's acts of insubordination were being noticed at Grupo Hotusa and a response to Ms. Bueno's insubordination began to be formulated.

**RESPONSE**: Disputed to the extent that this paragraph suggests that Plaintiff's leave was known by the Plaintiff to be "unauthorized." Sanjurjo admitted in an email to Lopez that Bueno was under the impression that her leave was authorized:

> The problem is I was commenting this with Cristina and I should have talked to Marta to tell her that the days were correct but it was not the best time for her to take them but I didn't ... however, Marta didn't ask again if it was ok (I suppose that as she sent me an email to explain the days that were missing she believed that was enough).

Pl. Ex. 26A [Doc. 139-71] at EU-2047; *accord* Sanjurjo Dep., 123:6–124:18 (witness translation). Ms. Bueno also believed she had approval to take the leave. Bueno Dep., 81:1-13, 93:4-6; 100:17-101:16; 103:3-8.

36.     On February 6, 2020, Ms. Bueno wrote to Ms. Marroquí to notify her that she was not going to return to work that day (which was the day she had originally requested as her return day) but that she would instead return to work in New York on February 14. *See* Ex. Def. 116, Email dated February 6, 2020, from Ms. Marroquí to Ms. Bueno. In that email, Ms. Bueno admitted that she was not entitled to those days off. "*I am sorry that I took days that I am not entitled to, and I understand that this is not favorable but I had to take care of the apartment and leave it in conditions to transition to the new tenant*."(FN3) Ms. Marroquí responded: "*I am very surprised by this email since you are in fact in Spain without the definite ok from Marta, with whom I copy for her information*." *Id*. Even though Ms. Marroquí informed Ms. Bueno of the adverse consequences that would result to Ms. Bueno, Ms. Bueno decided to remain in Spain.

> Footnote 3: Spanish original: "*Siento que me haya tenido que venir en fechas que no corresponden y entiendo que no ha sido muy favorable pero tenía que dejar el piso en condiciones y cerrar el cambio de inquilino.*"

**RESPONSE**: Disputed to the extent that this paragraph suggests that Plaintiff knew that her initial leave was "unauthorized." Marta Sanjurjo admitted in an email to Lopez that

Bueno was under the impression that her leave was authorized:

> The problem is I was commenting this with Cristina and I should have
> talked to Marta to tell her that the days were correct but it was not the best
> time for her to take them but I didn't ... however, Marta didn't ask again if it
> was ok (I suppose that as she sent me an email to explain the days that were
> missing she believed that was enough).

Pl. Ex. 26A [Doc. 139-71] at EU-2047; *accord* Sanjurjo Dep., 123:6–124:18 (witness

translation). Ms. Bueno also testified that she believed she had approval to take the leave.

Bueno Dep., 81:1-13, 93:4-6; 100:17-101:16; 103:3-8.

Also disputed is the incorrect claim that Defendants "informed Ms. Bueno of the

adverse consequences that would result," when, in fact, at no point did Defendants advise

Bueno that she could be reprimanded for taking leave (which she believed to be

authorized), nor did they provide her with a basis for her termination at any point after

terminating her from her employment. Def. Ex. 127 [Doc. 139-40] at MB-13; Bueno

Decl. ¶ 17.

37.     Ultimately, Ms. Bueno returned to New York on February 13, 2020. Def. Ex. 133,

Email dated February 5, 2020, containing Ms. Bueno's ticket reservation at MB 41-42.(FN4)

> Footnote 4: Ms. Bueno bought a plane ticket on January 16, 2020, to fly from
> Barcelona to New York, scheduled to return to New York on February 9, 2020,
> which was three days after the date she told Ms. Marroquí she would return to
> New York. Def. Ex. 134.

**RESPONSE**: Undisputed.

38.     When questioned during her deposition, Ms. Bueno reiterated no less than three

times that she overstayed even her second vacation request in order to handle construction being

done for the transition to the new tenant. Bueno Dep. 108:1-17; 106:16-22; 91:13-21.

**RESPONSE**: Disputed insofar as this paragraph misconstrues the Plaintiff's testimony.

At no point during her deposition does the Plaintiff use the word "construction," nor does

she describe anything that could be defined as "construction."

39.    Ms. Bueno did not disclose to Ms. Marroquí or anyone at Hotusa in any of her requests for time off that that she needed time to undergo IVF treatment in Spain. Marroquí Dep. 78:2-15; Sanjurjo Dep. 66:5-67:7. Both Ms. Sanjurjo and Ms. Marroquí testified that Ms. Bueno told her in writing that she needed to go back to Spain to deal with a tenant. Marroquí Dep. 94:10-16; Sanjurjo Dep. 122:25-123:16. This is undisputed even by Ms. Bueno. Bueno Dep. 91:7-92:6.

> **RESPONSE**: Disputed. Bueno advised Marroqui of her plans to undergo IVF treatments in September 2019, specifically advising Marroqui that she wanted IVF treatments because she was having difficulties getting pregnant naturally. (Bueno Dep., 229:11-16; Bueno Decl. ¶ 7). During this conversation, Bueno advised Marroqui that it was cheaper to receive IVF treatments in Barcelona. (Bueno Decl. ¶ 8). A few months later in December 2019, Plaintiff returned to this discussion with Marroqui (Bueno Dep., 223:14-224:7; 228:5-230:10), and Marroqui stated, in sum and substance, "that's nice, but, you know this company . . . Lopez doesn't like people taking leave because it ends up being a cost for the company. He wants employees to work no matter what." (Bueno Decl. ¶ 9).

40.    Ms. Bueno testified in December 2019 that she had disclosed orally to Ms. Marroquí that she would undergo IVF treatment. Bueno Dep. 223:14-224:7; 228:5-230:10. Ms. Marroquí denies that. Marroquí Dep. 78:2-15. However, even if Ms. Bueno had actually disclosed that she needed to go to Spain for IVF treatment, Ms. Bueno's own testimony directly contradicts such an allegation:

> Q. So you told Ms. Bueno -- I am sorry. You told Ms. Marroquí that you had to go to Barcelona to deal with a new tenant?
>
> MR. SHEHAN: Objection to form.

BY MS. RIBEIRO:

Q. Correct?

A. Correct.

Q. What was the actual reason why you wanted to go back to Spain during this period?

MR. SHEHAN: Objection to form.

A. I had to handle the changing of the tenant in the apartment.

BY MS. RIBEIRO:

*Q. Any other reason?*

*A. This was the reason for which I requested these days.*

*Q. Did you have to give a reason to request vacation?*

*A. No, not really, but since I had already left during Christmas, I had a good relationship with my supervisor and I thought it was best to give her an explanation of the reason that I was going.*

Q. What do you mean by good relationship with your supervisor?

A. We had a work relationship and also a personal one.

Bueno Dep. 91:6-92:10. (Emphasis added.)

**RESPONSE**: Disputed. Bueno advised Marroqui of her plans to undergo IVF treatments in September 2019, specifically advising Marroqui that she wanted IVF treatments because she was having difficulties getting pregnant naturally. (Bueno Dep., 229:11-16; Bueno Decl. ¶ 7). During this conversation, Bueno advised Marroqui that it was cheaper to receive IVF treatments in Barcelona. (Bueno Decl. ¶ 8). A few months later in December 2019, Plaintiff returned to this discussion with Marroqui (Bueno Dep., 223:14-224:7; 228:5-230:10), and Marroqui stated, in sum and substance, "that's nice, but, you

know this company . . . Lopez doesn't like people taking leave because it ends up being a cost for the company. He wants employees to work no matter what." (Bueno Decl. ¶ 9).

41.    In *none* of her written communications requesting additional time off did she mention IVF, either. Bueno 229:19-230:3; Exs. 114, 115, 116, 129, Email dated February 6, 2020, from Ms. Bueno to Ms. Marroquí and Mr. Orru. It is unclear why Ms. Bueno chose to hide the real reason she wanted to return to Spain so soon after her Christmas leave. However, it is unlikely that construction in her apartment was one of them. Mr. Gorla, Ms. Bueno's husband, stayed in Ms. Bueno's Barcelona apartment during the time that the IVF process was taking place, and he could not remember with any precision what construction work was being done at the apartment. Gorla Dep. 50:8-10; 51:4-22.

> **RESPONSE**: Disputed that "it is unclear why Ms. Bueno chose to hide the real reason she wanted to return to Spain so soon after her Christmas leave." Bueno advised Marroqui of her plans to undergo IVF treatments in September 2019, specifically advising Marroqui that she wanted IVF treatments because she was having difficulties getting pregnant naturally. (Bueno Dep., 229:11-16; Bueno Decl. ¶ 7). During this conversation, Bueno advised Marroqui that it was cheaper to receive IVF treatments in Barcelona. (Bueno Decl. ¶ 8). A few months later in December 2019, Plaintiff returned to this discussion with Marroqui (Bueno Dep., 223:14-224:7; 228:5-230:10), and Marroqui stated, in sum and substance, "that's nice, but, you know this company . . . Lopez doesn't like people taking leave because it ends up being a cost for the company. He wants employees to work no matter what." (Bueno Decl. ¶ 9). The inference is that Plaintiff omitted any reference to IVF treatment in her emails to Marroqui to avoid Lopez's wrath.

> This paragraph is also disputed insofar as it misconstrues the witness's testimony.

At no point during his deposition does Gorla use the word "construction," nor does he describe anything that could be defined as "construction."

### *While away in Barcelona without authority to do so, Ms. Bueno did not perform her job*

42.     During the period between February 4 and February 13, while she was away from her New York City post without authorization, Ms. Bueno performed none of her job responsibilities.(FN5) While she testified that she checked her emails, she admitted that she could not do local work (*i.e.*, visits to New York-area businesses) or submit marketing reports because while she was in Barcelona she could not make her weekly visits in the New York City area. Bueno Dep. 108:18-109:5. It is undisputed that she failed to deliver the January Company Control Report for the Wall Street Hotel. *See* Def. Ex. 117, Email dated February 10, 2020, from Marta Bueno to Sofie Vandeweyer and others. Ms. Bueno finally delivered the January report almost a month later, on February 25, 2020, after being prompted twice by Ms. Sofie Vandeweyer. Def. Ex. 118, Email dated February 25, 2020, from Marta Bueno to Sofie Vandeweyer. Bueno Dep. 109:2-115:8.

Footnote 5: *See* Rule 56 Statement, Paragraph 15, *supra*.

**<u>RESPONSE</u>**: Disputed. Emails produced by Defendants, as well as testimony from their witnesses, demonstrate that Bueno was in communication with her supervisors and working while in Barcelona. (Marroqui Dep., 98:10-99-2; Orru Dep., 94:5-8; 96:16-97:4; 98:3-8; 99:20-25).

43.     In addition, while in Barcelona Ms. Bueno did not devote attention to her sales role. She did not respond to emails on a timely basis and failed to submit her weekly report by February 3, 2020, about which Hotusa's President, Mr. López, was informed to. Pl. Exs. 21, 22, Emails dated February 3, 2020, from Ms. Bueno to Ms. Vandeweyer and others, and from Ms.

Marroquí to Mr. López. She also failed to participate meaningfully(FN6) in the creation of a marketing brochure for the Eurostars Wall Street, the hotel for which she was responsible. Bueno Dep. 115:10-118:7; 118:15-120:22; Def. Ex. 119, Email dated February 25, 2020, from Ms. Bueno to Noemí Martorell and Mr. Orru. Ms. Bueno declined to attend a conference call on February 4, 2020, scheduled by the North American director of marketing, Marco Orru, on the grounds that she was very busy that day. Bueno Dep. 118:9-123:14; Ex. 120, Email dated February 4, 2020, from Ms.Bueno to Mr. Orru.

> Footnote 6: She recants her previous testimony that she did not work on the brochure by mentioning a passage from another employee saying that "Marta approved the existing features." Bueno Dep. 122:9-22.

**RESPONSE**: Disputed. Emails produced by Defendants, as well as testimony from their witnesses, demonstrate that Bueno was in communication with her supervisors and working while in Barcelona. (Marroqui Dep., 98:10-99-2; Orru Dep., 94:5-8; 96:16-97:4; 98:3-8; 99:20-25).

*Corporate response to Ms. Bueno's unauthorized vacation*

44.    Once Ms. Marroquí learned that Ms. Bueno was in Spain without authority, she escalated the matter to Marta Sanjurjo, who is head of Human Resources for the companies of Grupo Hotusa. *See* Def. Ex. 116. Ms. Sanjurjo had already reported the matter to the president of Grupo Hotusa. Sanjurjo Dep. 107:20-112:20; 120:21-124:25.

**RESPONSE**: Disputed to the extent that this paragraph suggests that Plaintiff's leave was known by the Plaintiff to be "unauthorized." See Plaintiff's Response to Paragraph 35. This paragraph is also disputed to the extent that it suggests Sanjurjo was unaware of Plaintiff's leave request and plans to take leave, as, since January 14, 2020, Sanjurjo was deeply involved in the Defendants' internal confusion of whether Plaintiff had enough

accrued vacation days to take her requested leave, as follows:

- On December 26, 2019, Plaintiff emailed a leave request to Marroqui, advising she had to return to Barcelona around January 21, 2020 until February 1, 2020 or soon thereafter to manage a tenant matter. (Pl. Ex. 11A, Chickedantz Decl. ¶ 3, at EU-1066).

- On January 14, 2020, Marroqui forwarded an email from Bueno (explaining that she had eleven days of accrued vacation) to Sanjurjo, asking, "Can you confirm for me that this is the case?" (Def. Ex. 114A [Doc. 139-19] at EU-1461).

- On January 16, 2020, Marroqui forwarded Plaintiff's email (about reserving airfare for January 27 through February 6) to Sanjurjo, stating, "I need to know how to proceed with this vacation of Marta Bueno." (Pl. Ex. 14A [Doc. 139-63] at EU-1333).

- On January 17, 2020, Marroqui reforwarded to Sanjurjo the January 14, 2020 email from Bueno about her eleven accrued vacation days, and Sanjurjo responded, "I see it, but it's still not correct," and detailed how Bueno only had four days left for 2019, stating, "Perhaps she'll understand if you put it that way . . . ." (Pl. Ex. 17A, Chickedantz Decl. ¶ 5, at EU-576).

- On January 20, 2020, as management was still trying to determine how many days of accrued vacation were available to her, Bueno emailed Sanjurjo, copying Marroqui: "Cristina [Marroqui] tells me that I should send you an email explaining the issue of the unused vacation days. Here are the details." (Pl. Ex. 18A, Chickedantz Decl. ¶ 6, at EU-581). Plaintiff detailed why there was a discrepancy of seven days in 2019, which had to do with Defendants requiring Bueno to cancel a vacation and remain in New York to cover for another employee; and that she had 21 unused days from 2018, partly due to a medical issue that barred her from travelling. (*Id.* at EU-581-82).

- On January 21, 2020, Sanjurjo responded to Marroqui:

  > Can you ask Terry to share with you the vacation time she actually did take in 2018? I know it to be the case that Marta reported not having been able to catch the plane because she was sick, and that she later asked to take those vacation days from October 8 to 21, but it doesn't seem normal to me for her not to have informed you in early 2019 that she did in fact have unused vacation days. If she had unused days, wouldn't it be logical for her to take them over Christmas 2018? Vacation time can't be carried over in this way.

  (*Id.* at EU-580).

- Later that day, in response, Jimenez responded to Marroqui and Sanjurjo by email:

> The requests I have are for 14 days from August 13 to 26, being those that were put back to October and that were the two weeks that were owed from 2017. In addition to those 14 days that could not be taken in August, she took an additional week in October from October 1 to 7.
>
> From what I've been able to read in an email on which I was copied, she completed her vacation time for 2018 with a week that you (Cristina) authorized for her from July 1 to 7, 2019. From that point I don't recall what happened. I know she had to return to Spain and postpone her vacations because she had to return to NY so Pablo could go to Chicago.

(*Id.*)

- On January 22, 2020, Sanjurjo wrote comments within the text of the January 20, 2020 email from Bueno (explaining why she had accrued vacation days from 2018), and forwarded it to Marroqui and Jimenez, commenting, "I see that this topic is even more complicated. Let's see if we can reconstruct this. I've inserted my comments in red." (Pl. Ex. 19A, Chickedantz Decl. ¶ 7, at EU-583). Within the text of Bueno's email, Sanjurjo highlighted the sections where Bueno explained that she had accrued days from 2018, and said, "*This is where the problem lies.*" (Pl. Ex. 19A, Chickedantz Decl. ¶ 7, at EU-584 (emphasis in original)).

Sanjurjo ultimately concluded that Bueno in fact had sufficient accrued vacation days to take her requested leave, and admitted that this is why Bueno believed that she had approval to take her leave, as noted in a February 4, 2020 email from Sanjurjo to Lopez, which states, *inter alia*: "The problem is I was commenting this with Cristina and I should have talked to Marta to tell her that the days were correct but it was not the best time for her to take them but I didn't ... however, Marta didn't ask again if it was ok (I suppose that as she sent me an email to explain the days that were missing she believed that was enough)." Pl. Ex. 26A [Doc. 139-71] at EU-2047 (certified translation); *accord* Sanjurjo Dep., 123:6–124:18 (witness translation).

26

45.    Ms. Sanjurjo testified at her deposition that once she learned that Ms. Bueno had abandoned her job post, she started to discuss internally what to do about Ms. Bueno rank insubordination. Sanjurjo Dep. 133:4-136:25.

**RESPONSE**: Undisputed, except see Plaintiff's Response to Paragraph 44.

46.    On February 10, 2020, after receiving an email from another employee reporting that Ms. Bueno had failed to deliver one of her reports, Ms. Marroquí again wrote to Marta Sanjurjo asking her for guidance on how to proceed concerning Ms. Bueno. *See* Pl. Ex. 32, Email dated February 10, 2020, from Ms. Marroquí to Ms. Sanjurjo, at Eurostars001681; Pl. Ex. 30, Email dated February 10, 2020, from Ms. Marroquí to Ms. Sanjurjo, at Eurostars001674. Moreover, on February 17, 2020, Ms. Marroquí informed Mr. López about Ms. Bueno's unauthorized leave. *See* Pl. Ex. 37, Email from Ms. Marroquí to Mr. López dated February 17, 2020, reporting on commercial activity of regional managers, at Eurostars000898.

**RESPONSE**: Undisputed.

47.    In other words, a decision to terminate Ms. Bueno was being formulated well before Ms. Bueno learned that she was pregnant. It is uncontroverted that Ms. Sanjurjo had decided to fire Ms. Bueno before February 20. Sanjurjo Dep. 130:19-131:17; 132:18-133:9.

**RESPONSE**: Undisputed.

48.    On February 18, 2020, Ms. Patricia Cereijo received a copy of Ms. Bueno's termination letter from the lawyers for Grupo Hotusa. *See* Pl. Ex. 38, Email dated February 18, 2020, from Patricia Cereijo to Carla Isbert and others. She was instructed to make arrangements to deliver the letter to Ms. Bueno personally in New York. *Id.*

**RESPONSE**: Undisputed.

49.    February 18, 2020, was two days before Ms. Bueno claimed she told Ms.

Marroquí that she was pregnant. *See* Compl., at ¶ 77, ECF#62. Ms. Bueno does not allege that she told anybody else in the company that she was pregnant until February 25. Ms. Bueno admitted that she told Ms. Cereijo she was pregnant after she received her termination letter. Bueno Dep. 71:17-21, 73:9-11.

**RESPONSE**: Undisputed.

### The IVF process and the pregnancy

50.    Ms. Bueno's IVF process started on January 16, 2020, when she started to take estrogens. Bueno Dep. 126:21-127:2; 149:6-9; Def. Ex. 121, IVF Clinical Report. Ms. Bueno thus needed to go back to Spain to perform the transfer as her eggs were stored there. Bueno Dep. 149:10-15. She had an ultrasound on January 27, 2020, when her endometrial lining was measured. A decision to defrost Ms. Bueno's eggs was made by her physician shortly thereafter. Bueno Dep. 126:6-128:5.

**RESPONSE**: Undisputed.

51.    At her deposition, Ms. Bueno admitted that the real reason she was very busy on February 4 was because she had an embryo transfer that day. Bueno Dep. 125:3-14; Def. Ex. 121, at MB-00047.

**RESPONSE**: Undisputed.

### Ms. Bueno's knowledge that she had become pregnant

52.    After the embryo transfer, Ms. Bueno testified that she learned she was pregnant on February 14. Bueno Dep. 154:8-159:18. Ms. Bueno admitted that following a urine test on February 14 she saw a faint line in her test. She asked the clinic what it meant, and the clinic told her that they did not know what it meant and that she needed to follow up with a blood test the following Monday, on February 17. Bueno Dep. 156:14-157:16. She admitted that her pregnancy

hormone on February 14 was very low and that this caused doubts in Ms. Bueno's mind as to whether her pregnancy was viable. Bueno Dep. 157:5-158:20.

**RESPONSE**: Undisputed.

53.    Ms. Bueno admitted that she wrote to the IVF clinic on February 18 and asked what to do based on the blood and urine results she had received. Bueno Dep. 161:1-165:18. On February 18, Ms. Bueno again wrote to the IVF clinic informing them that the New York clinic had told her that her most-recent pregnancy blood test was negative, but that her urine pregnancy test was positive. Def. Ex. 122, Email exchange between Ms. Bueno and IVF Clinic, at MB00158. She also asked whether she should continue her hormone treatment if the test in the future turned out positive. *Id.* at MB-00158-160. On February 18, the IVF clinic responded that if the results were negative, she should stop taking hormones and if the result was positive, she should have an ultrasound 8 to 10 days thereafter. *Id*. at MB-00159.

**RESPONSE**: Undisputed.

54.    On February 19, in response to Ms. Bueno's February 18th email, the IVF clinic requested her to retake the "beta" (blood) test in two days. Def. Ex. 122, at MB-00158. Ms. Bueno admitted that she asked the IVF clinic whether she should stop the medications should the results come back negative. Bueno Dep. 164:14-19.

**RESPONSE**: Undisputed.

55.    Ms. Bueno had an ultrasound on February 20th. Bueno Dep. 165:3-168:22. *See* Def. Ex. 130, Gynecological Report dated February 27, 2020. This document was produced to the Defendants only after Ms. Bueno's deposition.(FN7) Defendants' counsel has not had a chance to question Ms. Bueno on this document but it appears that the report produced on February 27, 2020, at 11:25 am was the result of an ultrasound performed on Ms. Bueno on

February 20, 2020 at **5:15 pm**. This report does not find a fetus but rather it says that the

gestational sac had been visualized. *Id*. Four days later, on February 24, Ms. Bueno had a second

ultrasound in which a fetus was visualized. *Id.* at MB-00396.(FN8)

> Footnote 7: During her deposition, Ms. Bueno said that she had had an ultrasound on February 20, the day on which Ms. Bueno allegedly told Ms. Marroquí that she was pregnant. Astoundingly, this ultrasound, which was performed at 5:15 p.m. on February 20, 2020, was not produced until after Ms. Bueno's deposition. Bueno Dep. 168:2-173:6.

> Footnote 8: Counsel was unable to question Ms. Bueno on this ultrasound, which was produced only after Ms. Bueno's deposition.

56.    **RESPONSE**: Disputed to the extent that this paragraph suggests that Plaintiff did

not know she was pregnant before disclosing to Marroqui that she was in fact pregnant. On

February 14, 2020, Plaintiff learned that the IVF treatments had been successful and that she was

pregnant. (Bueno Dep., 158:5-10). On February 20, 2020, Plaintiff advised Marroqui that the

IVF had been successful and that she was pregnant. (Bueno Dep., 204:16-22; Bueno Dec. ¶ 16).

As to Defendants' footnotes 7 & 8: Defendants continue airing old grievances that were raised in

their unsuccessful motion to compel, which was denied in relevant part. (*See* Discovery Order

[Doc. 116] dated June 12, 2024.) As explained more fully in Plaintiff's opposition to the

Defendants' motion to compel, Defendants possessed some of the documents in question for

about three months before Plaintiff's deposition, but apparently Defendants did not know it. (*See*

Pl. Opp. to Mot. to Compel [Doc. 112] dated June 2, 2024.) Moreover, the documents concern

events that Plaintiff testified about during her deposition, namely sonograms and blood tests in

February and March 2020, which show that her *in vitro fertilization* (IVF) was successful. (*Id.*) It

is dilatory for Defendants to continue airing old grievances on which the Court has already ruled.

Ms. Bueno first heard the baby's heartbeat on March 5, 2020. Bueno Dep. 187:14-188:4.

**RESPONSE**: Undisputed.

***HOTUSA's knowledge that Ms. Bueno was pregnant***

57.    On February 25, 2020, Patricia Cereijo personally delivered the termination letter to Ms. Bueno. Bueno Dep. 71:11-73:7. Ms. Bueno admitted at her deposition that she told Ms. Cereijo that she was pregnant then. Bueno Dep. 71:17-21, 73:9-11. This testimony was corroborated by Ms. Bueno's own husband, who testified in no uncertain terms that Ms. Bueno told Eurostars she was pregnant at the meeting when Ms. Bueno was handed her termination letter, *i.e.,* on February 25, 2020. Gorla Dep. 80:10-81:15.

Q. Mr. Gorla, who fired Ms. Bueno?

A. As an individual or –

Q. Yes.

A. I mean, from how I -- so she had received a letter to her saying that you are terminated. From there, I don't know the --the -- the hotel hierarchy on whether it goes to the -- directly to her boss or where the -- the command of chain comes down to actually terminate her.

Q. Who gave -- did she meet in person, or did she receive an e-mail stating that she was terminated?

A. Meet in person.

Q. Do you recall who met with her?

A. An employee from the Chicago Eurostars offices.

(Reporter clarification.)

A. The Chicago hotel.

Q. And was that when Ms. Bueno told Eurostars that she was pregnant?

A. Yes. That -- I -- that's when – I know once -- when that letter was handed to her, she had -- did -- she did say she was -- she was pregnant.

MS. RIBEIRO: Okay. I have no further questions.

**RESPONSE**: Undisputed.

58.     Yet, Ms. Bueno has alleged in her complaint that she told Ms. Marroquí she was pregnant on February 20, 2020, during a call that lasted one minute and four seconds. Bueno Dep. 199:6-21; *see* Compl., at ¶ 77, ECF #62.

**RESPONSE**: Undisputed. On February 20, 2020, Plaintiff advised Marroqui that the IVF had been successful and that she was pregnant. (Bueno Dep., 204:16-22; Bueno Dec. ¶ 16).

59.     Ms. Marroquí denied that Ms. Bueno disclosed she was pregnant during that call. Def. Ex.125, Email dated March 2, 2020, from Ms. Marroquí to Ms. Sanjurjo, at Eurostars001935. Furthermore, the documentary evidence supports Ms. Marroquí's version in that, later on that day Ms. Bueno indeed sent these corporate agreements to Ms. Marroquí and Mr. Orru. *See* Def. Ex. 135, Email dated February 20, 2020, from Ms. Bueno to Ms. Marroquí and Ms. Sanjurjo attaching corporate agreements. Ms. Marroquí only found out that Ms. Bueno was pregnant on the day of Ms. Bueno's termination on February 25, 2020. Marroquí Dep. 64:11-65:10. After she learned that Ms. Bueno had been terminated and that she was pregnant, on February 26, 2020, Ms. Marroquí sent Ms. Bueno a WhatsApp text message congratulating Ms. Bueno on her pregnancy. Pl. Ex. 4, WhatsApp text message log between Ms. Bueno and Ms. Marroquí, at Eurostars000563.

> [2/26/20, 4:17:30 p.m.] Cristina Marroquí: Good morning, Marta. Yesterday evening, Patricia called me. Personally, it has been a pleasure working with you and I wish you the best of luck both personally and professionally. Congratulations on your pregnancy and your marriage. I wish the best for you, truly.

**RESPONSE**: Disputed. On February 20, 2020, Plaintiff advised Marroqui that the IVF had been successful and that she was pregnant. (Bueno Dep., 204:16-22; Bueno Dec. ¶ 16).

60.     (Incorrectly numbered "61") Notably, Ms. Marroquí would have no reason to congratulate Ms. Bueno if she had known about her pregnancy on February 20.

**RESPONSE**: Disputed. *See* Plaintiff's Response to Paragraph 59.

Dated: New York, New York
          November 23, 2024

Respectfully submitted,

*/s/ Maria L. Chickedantz*
Maria L. Chickedantz, Esq.
CHICKEDANTZ LAW
112 Washington Ave, No. 1
Brooklyn, New York 11201
347-699-8784
maria@chickedantzlaw.com

*/s/ Stephen Bergstein*
Stephen Bergstein, Esq.
BERGSTEIN & ULLRICH
5 Paradies Lane
New Paltz, New York 12561
845-469-1277
steve@tbulaw.com

*/s/ Kevin J. Shehan*
Kevin J. Shehan, Esq.
SHEHAN LEGAL, PLLC
845 Third Avenue, 6th Floor
New York, New York 10022
917-740-7805
kevin@shehanlegal.com

*/s/ Paul S. Haberman*
Paul S. Haberman, Esq.
LAW OFFICES OF PAUL S.
HABERMAN LLC
19 Engle Street, Tenafly,
New Jersey 07670 (All Mail)
88 Pine Street, 22nd Floor
New York, New York 10006
201-564-0590
psh@paulhabermanlaw.com

*Attorneys for Plaintiff*

33